# FIDELITY AND DEPOSIT COMPANY v. COURTNEY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 178. Argued March 3, 4, 1902.—Decided June 2, 1902.

In an action brought by the receiver of a national bank appointed by the Comptroller of the Currency upon a bond of indemnity given to hold the bank harmless against fraud of a specified officer, it was contended that the court erred in admitting in evidence a notice of the default of the

officer, given to the surety company by the receiver within from ten to seventeen days after the discovery of the default, and in instructing the jury that the requirement in the bond that immediate notice should be given of a default was fulfilled by giving notice as soon as reasonably practicable and with promptness, or within a reasonable time. *Held* that the trial court did not err in refusing to instruct, as a matter of law, that the notice was not given as soon as reasonably practicable, under the circumstances of the case, or without unnecessary delay, and in leaving the jury to determine the question whether the receiver had acted with reasonable promptness in giving the notice.

The court points out an error in excluding evidence, but further holds that as the very question which the jury would have been called upon to determine if the evidence had been received, was fully submitted to them and was necessarily negatived by their verdict, no foundation exists for holding that prejudicial error resulted from excluding the evidence.

If the court below in anywise erred, it was in giving instructions which were more favorable to the defendant than was justified by the principles of law applicable to the case.

To instruct the jury in broad terms that if they found that the directors were careless in the management of the bank generally, they should find for the defendant, could only have served to mislead.

The action below was brought, on February 5, 1898, by Courtney, as receiver of the German National Bank of Louisville, appointed by the Comptroller of the Currency on January 22, 1897, four days after the closing of the bank. Recovery was sought upon a bond of indemnity for ten thousand dollars and renewals thereof, taking effect respectively on June 1, 1894, June 1, 1895, and June 1, 1896. The condition of the bond was to hold the bank harmless against any loss which it might sustain by reason of any fraud committed by Jacob M. McKnight, originally as vice president and later as president of the bank. The sum of $18,742.74 was alleged to have been dishonestly and fraudulently embezzled, and misapplied out of the funds of the bank from July 1, 1894, to January 4, 1897, by McKnight, either as vice president or president, and a statement of the items was embodied in the petition. Due proof of the claim was averred to have been made on July 2, 1897. By answer and amendments thereto the defendant took issue as to the happening of each of the alleged defaults; it averred that McKnight, prior to January 21, 1896, had indulged in speculations in whisky and tobacco and in disreputable and unlawful

habits and pursuits; it further averred that the cashier and teller (one and the same individual), or the vice president of the bank, who became such when McKnight became the president, or the directors thereof, at or about the time of the happening of the defaults, had knowledge of the same, and that the bank condoned the defaults of McKnight for which recovery was sought. In effect, also, it was alleged that there had been a violation of each of the other conditions and stipulations of the bond. The amended answer concluded with the following averment:

"When said bond of June 1, 1894, given by defendant to said bank for the fidelity of said McKnight, as set out in the petition, was renewed for another year on June 1, 1895, to cover the period from that date to June 1, 1896, and was again renewed and continued on June 1, 1896, to cover the period from that date to June 1, 1897, said bank, through an officer other than said McKnight, represented and asserted and certified, with the knowledge of the directors of the said bank, that the books and accounts of said McKnight had been examined by said bank and were then found to be correct in every respect, and that all moneys handled by him had been accounted for up to that time, and that he had performed his duties in an acceptable and satisfactory manner, and that said bank knew of no reason why the guaranty bond executed by this defendant should not be continued; but defendant says that, in fact, said statements, assertions, and certificates were, and each of them was, false and fraudulent, and known by said bank to be false and fraudulent, but the defendant did not know the same to be false or fraudulent, and, on the contrary, the defendant believed and relied on said statements and each of them, and but for said statements, assertions, and certificates, the defendant would not have renewed or continued said bond on June 1, 1895, or June 1, 1896, and the defendant would immediately have canceled and revoked said bond, as it had a right to do, and as the said bank knew it had a right to do. The said bank purposely withheld from the defendant the proper information as to the acts and conduct and accounts of said McKnight, and thus misled and deceived the defendant."

A reply was filed controverting the affirmative allegations

of the answer, and the cause was tried to a jury. Various exceptions were taken by the defendant to the exclusion of offered evidence and to instructions to the jury. A verdict was returned for plaintiff, and from the judgment entered thereon an appeal was taken to the Circuit Court of Appeals for the Sixth Circuit. That court affirmed the judgment. 103 Fed. Rep. 599.

A writ of certiorari was then allowed.

*Mr. Thomas A. Whelan* and *Mr. Edward J. McDermott* for petitioner. *Mr. St. John Boyle* was on their brief.

*Mr. W. M. Smith* for defendant in error.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

We shall consider under separate headings the several propositions upon which reliance is placed to demonstrate that error was committed by the trial court.

1. The court erred in admitting in evidence a notice of the default of McKnight given to the surety company by the receiver on February 18, 1897, and in instructing the jury that the requirements in the bond, that immediate notice should be given of a default, were fulfilled by giving notice "as soon as reasonably practicable and with promptness" or "within a reasonable time."

The bank was closed by the Comptroller on January 18, 1897, and the receiver was appointed four days afterwards. The experts employed by the receiver to examine the books of the bank began to discover the defaults of McKnight "about two or three weeks after the bank was closed." The notice by the receiver to the surety company that McKnight was a defaulter was given on February 18, 1897. It follows that the notice was given within ten to seventeen days after the first discovery of a default. Both the trial court and the Circuit Court of Appeals, reviewing numerous authorities, held that the requirement in the bond " that the employer shall im-

mediately give the company notice in writing of the discovery of any default or loss " ought not to receive the construction that it was intended by the parties that notice of a default should be given instantly on the discovery of a default, but that what was meant was that notice should be given within a reasonable time, having in view all the circumstances of the case. In so deciding we think the court did not err. Indeed, this construction of the word "immediate" would seem to be applied in practice, as is illustrated by the bond of indemnity considered in the case of the *Guarantee Co.* v. *Mechanics' &c. Co.*, 183 U. S. 402, where one of the conditions was "that the company shall be notified in writing of any act on the part of said employé which may involve a loss for which the company is responsible hereunder to the employé *immediately or without unreasonable delay.*"

A quite recent case, decided by the Supreme Court of New Hampshire, *Ward* v. *Maryland Casualty Co.*, 51 Atlantic Reporter, 900, so lucidly states the true construction of the word immediate as employed in a bond cognate to the one under consideration, that we excerpt a passage from the opinion (p. 902):

" The defendants' liability depends in part upon the answer to the question whether the plaintiffs gave them 'immediate' notice in writing of O'Connell's accident, the claim made on account of it, and the suit that was brought to enforce the claim. This involves an ascertainment of the meaning of the word 'immediate' as used in the policy. The word, when relating to time, is defined in the Century Dictionary as follows: 'Without any time intervening: without any delay; present; instant; often used, like similar absolute expressions, with less strictness than the literal meaning requires,—as an immediate answer.' It is evident that the word was not used in this contract in its literal sense. It would generally be impossible to give notice in writing of a fact the instant it occurred. It cannot be presumed that the parties intended to introduce into the contract a provision that would render the contract nugatory. As 'immediate' was understood by them, it allowed the intervention of a period of time between the occurrence of the

fact and the giving of notice more or less lengthy according to the circumstances. The object of the notice was one of the circumstances to be considered. If it was to enable the defendants to take steps for their protection that must necessarily be taken soon after the occurrence of the fact of which notice was to be given, a briefer time would be required to render the notice immediate according to the understanding of the parties than would be required if the object could be equally well attained after considerable delay. For example, a delay of weeks in giving notice of the commencement of the employé's suit might not prejudice the defendants in preparing for a defence of the action, while a much shorter delay in giving notice of the accident might prevent them from ascertaining the truth about it. The parties intended by the language used that the notice in each case should be given so soon after the fact transpired that, in view of all the circumstances, it would be reasonably immediate. If a notice is given ' with due diligence under the circumstances of the case, and without unnecessary and unreasonable delay,' it will answer the requirements of the contract. *Chamberlain* v. *Insurance Co.*, 55 N. H. 249, 265, 268; May, Ins. (1st ed.) § 462; Id. (14th ed.) § 1089; *Donahue* v. *Insurance Co.*, 56 Vt. 375; *Lockwood* v. *Assurance Co.*, 47 Conn. 553, 568. Whether the notices were reasonably immediate,—like the kindred question of what is a reasonable time,— are questions of fact that must be determined in the superior court. *Tyler* v. *Webster*, 43 N. H. 147, 151; *State* v. *Plaisted*, Id. 413; *Chamberlain* v. *Insurance Co.*, 55 N. H. 265; *Austin* v. *Ricker*, 61 N. H. 97; *Ela* v. *Ela*, 70 N. H. 163, 165; 46 Atl. 414."

We think the trial court was right in refusing to instruct, as a matter of law, that the notice was not given as soon as reasonably practicable under the circumstances of the case, or without unnecessary delay, and in leaving the jury to determine the question whether the receiver had acted with reasonable promptness in giving the notice.

2. The court erred in instructing the jury that the proof of claim sent to the surety company by the receiver on July 2,

1897, was made "as soon as practicable" after the giving of notice of the default of McKnight.

This objection is also without merit. The requirement of the bond was that the employer "shall file with the company his or her claim hereunder, with full particulars thereof, as soon as practicable" after the giving of written notice of a default or loss. What was required was not a partial, but a full statement of all the items of claimed misappropriations on which the right to recover upon the bond was based. The investigation to ascertain the various defaults of McKnight continued after the giving of the preliminary notice of default, and the evidence in the record fails to give any support to the contention that the proof of claim was unreasonably delayed, and was not made as soon as practicable after the full particulars thereof were ascertained.

3. The court erred in instructing the jury that the averments contained in the petition filed by the receiver in an action in attachment against McKnight, brought in a state court of Kentucky, on March 6, 1897, to recover various items of alleged indebtedness of McKnight to the bank, should be given no effect in their deliberations, as but one of said items was embraced in the present action.

The petition referred to was presumably introduced in evidence on behalf of the defendant, as tending to establish that the proof of claim was not made by the receiver as soon as practicable after the giving of notice that McKnight had been guilty of a default. While the trial judge did not state the reasons which led him to instruct the jury to disregard the statements in the petition, the reason for such action was manifest. The petition counted upon various items, a portion only of which were embraced in the petition in the action on trial, and the fact that the petition in the attachment action showed that when filed the receiver knew of some of the misappropriations of McKnight, did not tend to prove that he then had knowledge of all of the defaults of McKnight.

4. The court erred in refusing to permit the defendant to read as evidence to the jury a letter of Edwin Warfield, president of the defendant, and dated May 15, 1896, and addressed

to the German National Bank of Louisville, Kentucky, and also the reply of R. E. Reutlinger, the cashier of the said bank, written on May 29, 1896, addressed to the defendant, said letter having been an inquiry by the president of the defendant as to the renewal of the bond of McKnight, and the response being an assurance by the cashier of the bank that McKnight had up to that time performed his duties in an acceptable and satisfactory manner, and he, the cashier, knew of no reason why the bond should not be continued.   These letters, it being contended, were erroneously excluded on the ground that it had not appeared from the evidence that there was special authority from the board of directors to the cashier to write the letter of response of May 29, 1896.   Further, the court also, it is asserted, erroneously refused to allow the defendant to prove by circumstantial evidence that the board of directors selected the bondsman of McKnight and paid for the bond, and that the said cashier was acting in this matter with the knowledge and for the benefit and with the approval of the board of directors.

We are constrained to the conclusion that error was committed in rejecting the evidence referred to in the foregoing contention.   It was competent for the defendant to show that the bank had concerned itself in and about the obtaining of the bond and renewals in such manner as to cause the transaction to become in effect the business of the bank.   The bank had notice from the terms of the original bond that it was issued in reliance upon statements and representations made on its behalf to the surety company, and that, in the ordinary course, renewals, which were to be optional with the surety company, might also be based upon further statements to be made on behalf of the bank.   Thus, in the original bond, it was recited that "The said employer has delivered to the company a certain statement, it being agreed and understood that such statement constitutes an essential part of the contract hereinafter expressed."   It was a reasonable and proper precaution, in anticipation of a desired renewal, to propound the inquiries which were submitted by the surety company.   The inquiry was contained in a written communication, addressed *to the bank*, it was received by the bank, and it was proper to presume that it was

delivered to the official who made reply thereto, by authority of the bank, he being the executive officer who was charged with conducting the correspondence of the bank. We think the making of the certificate was an act done in the course of the business of the bank, by an agent dealing with the surety company for and on behalf of the bank. It did not purport to be, nor was it designed to be, the mere personal representation of the individual who filled the office of cashier, but it was an official act, performed on behalf of the bank. The information solicited was such as was proper to be asked of and communicated by the bank, and as the renewal was presumably made upon the faith of the statements contained in the certificate, the bank ought not to be heard, while seeking to obtain the benefits of the stipulations agreed to be performed by the surety, to deny the authority of its officer to make the representations which induced the surety to again bind itself to be answerable for the faithful performance by McKnight of the duties of his employment. *Railway Companies* v. *Keokuk Bridge Co.*, 131 U. S. 371. In *Guarantee Co.* v. *Mechanics' &c. Co.*, 183 U. S. 402, this court recognized as binding upon the bank a certificate given by one of its officers embodying replies to questions asked by the guarantee company respecting one of the employés of the bank, although no proof was introduced that special authority had been conferred upon the officer to make the certificate. Nor does the ruling in *American Surety Company* v. *Pauly*, 170 U. S. 156, warrant the claim that it is an authority against the admissibility of the certificate here in question. In the bond considered in the *Pauly* case, it was not agreed that the statement of the president, upon which the bond was obtained, should be the basis of the bond. The answers made by the person who was president of the bank to the interrogatories of the surety company were but mere commendations by one individual of another individual, at a time when, as said by the court, " no relations existed between the bank and the surety company." Again, in the *Pauly* case, no letter of inquiry was addressed to the bank, unlike the practice pursued with respect to the renewal here in controversy, and the letter, whose contents in the *Pauly* case was claimed to be

binding on the bank, was written by one who was not charged with the duty of conducting the correspondence of the bank. As held in *Xenia Bank* v. *Stewart*, 114 U. S. 224, a communication which on its face evidences that it was written by the cashier of a bank, should not be excluded from the jury as not being an act of the bank, where "it appears with reasonable certainty to have regard to the business of the bank." In the case at bar it is manifest these elements were present, and the exclusion of the certificate, as also of the evidence designed to establish that the giving of the certificate was an act done in the course of the business of the bank, was erroneous.

But the fact that error was committed in the particulars just stated does not necessarily lead to a reversal, since the settled doctrine is that even if error has been committed, yet if it appears clearly from the record that such error was not prejudicial, the judgment cannot be disturbed. *Origet* v. *Hedden*, 155 U. S. 228, 235; *Fidelity Association of Philadelphia* v. *Mettler*, 185 U. S. 261. In order to determine whether prejudice resulted from the rulings referred to, it becomes essential to state the facts as portrayed in the bill of exceptions.

McKnight was for a period of time vice president and subsequently the president of the German National Bank. Any and all claims which may have been asserted in the petition as to misconduct or default on the part of McKnight prior to the 1st of January, 1896, were abandoned at the trial, and there is nothing in the record to support the contention that anything took place prior to that date which affected the truth of the statement made in the certificate given by the cashier on May 29, 1896. In January, 1896, McKnight was president and a director; Adolph Reutlinger was vice president and a director, and R. E. Reutlinger was cashier and teller of the bank.

On January 14, 1896, the mayor of the city of Louisville died. The vacancy occasioned was to be filled by the municipal council of the city, and McKnight became a candidate for the office. There was an active contest, and the incidents connected with the election became the subject of discussion in the public press and of consequent notoriety in the community. One Edmunds, who was a business partner of McKnight, was

a prominent factor in said contest, as representing the interest of McKnight, and Edmunds frequently visited the bank and conferred with McKnight in respect to the contest. Edmunds, on his visits to the bank, " was often seen by and had conversations with the vice president and other directors of the bank, who knew the purpose of his visits." The firm of S. E. Edmunds & Co., composed of McKnight and Edmunds, had an account on the books of the bank. Edmunds, however, had no individual account with the bank.

On January 18, 1896, Edmunds came to the bank and there drew his personal check on the bank for the sum of $1000. McKnight directed this check to be cashed, and, as Edmunds wished ten one hundred dollar bills for the check, McKnight, in the hearing of the vice president, told the cashier to take one thousand dollars and go to a neighboring bank and get the denomination of bills desired, which he did, and they were handed over to Edmunds. The check of Edmunds which had been thus cashed, although he had no individual account with the bank, was, by the direction of McKnight, carried by the cashier as a cash item until March 12 following. On the date last named, by the direction of McKnight, the amount was charged to the account of S. E. Edmunds & Co., it not appearing that the effect of this debit was to overdraw this latter account.

It was shown that at the time Edmunds drew this check there was an understanding between himself and McKnight that he, McKnight, should be responsible for the check and see that it was paid. The money which Edmunds received it was proven was used by him in bribing four members of the city council to vote for McKnight for mayor, and in consideration of the payment, the parties, on receiving the money, signed the following agreement:

" I hereby pledge myself to vote for J. M. McKnight for mayor of the city of Louisville, first, last, and all the time, until elected or defeated before the general council."

There was no proof introduced to show that the officers or directors of the bank, other than McKnight, had any knowledge of the purpose for which the check was drawn or the use which

was made of it, unless it be that the fact that they knew that McKnight was a candidate for mayor had a tendency to show that he was engaged in unlawful practices.

On January 21, 1896, to pay his own debt, McKnight drew his individual check (he having an individual account with the bank), for $1253, to the order of a person to whom he was personally indebted. This check was paid. McKnight instructed the cashier not to have this check charged up but to carry it as cash, and it was so carried until March 12, 1896, when McKnight directed that the check be debited to the account of S. E. Edmunds & Co., which was done. Subsequently, and prior to the 12th of March, 1896, another check was drawn by McKnight, on his individual account, for $1650, and was paid and carried by the cashier, by McKnight's direction, as cash, until March 12, 1896, when it was charged up to the Louisville Deposit Collateral account. This latter was an account on the books of the bank of which McKnight had the management and control as president of the bank, but in which he had no personal interest. It was shown that the carrying of these checks by the cashier in his cash as money was called to the attention of the vice president of the bank, who made inquiry on the subject as to why it was done and was informed that it was done at the request of McKnight, the latter presumably directing the checks to be charged as above stated, in consequence of such inquiry.

McKnight was defeated for mayor. It was matter of common knowledge in Louisville that there was great dissension between the elected mayor and members of the boards of aldermen and councilmen and that members of the board of aldermen were endeavoring to block legislation proposed by the new mayor. There was proof tending to show that McKnight fomented this discord, and drew up a paper, which was signed by five aldermen, pledging themselves to be controlled in the performance of their duties by McKnight. Two other signatures, however, were required to get control of the board. McKnight was informed by Edmunds that two aldermen were wavering, and that to obtain their signatures to the agreement it would be necessary to pay each of them $1000. On Febru-

ary 6, 1896, McKnight requested the cashier to remain at the bank and keep the vault open after the regular time for closing, and said to him that he " had a big scheme on hand, and that it was a big thing." The bank was kept open, and at about half-past six Edmunds brought to the bank the two aldermen in question. Thereupon, in the presence of these two men and the cashier, Edmunds prepared a note, which was then signed by the two aldermen, as follows:

" $2000.00. LOUISVILLE, KY., February 6, 1897.

" One year after date we promise to pay to the order of ourselves two thousand dollars without defalcation, value received, negotiable and payable at German National Bank."

After signing the note, the two aldermen went upstairs, later returned to the bank office, and then received from the cashier, who acted under the instructions of McKnight, the sum of $2000 in currency.

It was shown that, while upstairs in the bank building, the two aldermen affixed their signatures to the following paper, which had already been signed by five other of the aldermen:

" LOUISVILLE, KY., February 5th, 1896.

" We do this day and date agree with one another, and bind ourselves on our sacred words and honor, that we will stand together on any and all propositions of legislation that may come before the body of which we are members, namely, the board of aldermen of the city of Louisville; that we will so caucus with our friend J. M. McKnight, and act wisely, and secure for our friends an equal division of the offices and any profit that may arise therefrom; that we, as men and members of the upper board, will not allow the mayor to force upon us any appointments that we do not deem wise and to our interest, and in so doing will not act the first night of a meeting on any proposition sent in by the mayor, but will take one week for consideration and caucus.

" Now we have calmly considered the above, and do again pledge ourselves one to the other before subscribing our names this day and date, February 5th, 1896, in the presence of one and the other."

There was no testimony tending to show knowledge on the part of the bank, or any of its officers and directors, other than McKnight, of the purpose for which this $2000 was paid, or of the relations which existed between McKnight and the men to whom it was paid, unless such knowledge was lawfully inferable from the circumstances above stated and those hereafter mentioned.

On the night of the occurrences above detailed the cashier of the bank went to the residence of his father, the vice president, and told him of the keeping open of the bank that evening and the cashing of the note. The next morning the vice president asked McKnight for an explanation of the matter, and the latter responded that the transaction was all right and that the note was good, and that it would be guaranteed by men of credit, whom he named. McKnight also said that he would guarantee the payment of the note; that the parties were obliged to have the money that night, and he kept the bank open to let them have it. When this conversation was had McKnight had a long, yellow envelope in his hand, and he told the vice president that "he had a document there in his pocket which was signed by those fellows;" that "he had a meeting upstairs and that paper was signed, and he would not sign it for the city of Louisville;" but McKnight did not mention the names of the persons who had signed it. The vice president noticed that the bank was to get no interest on the loan. He informed other members of the board of directors, and shortly afterwards the matter was brought before the board for its consideration. The vice president reported to the board that he had made some investigation and could not find that two aldermen who had signed the note had any property, and he was unable to say whether or not they were good. McKnight made the same statement to the board that he had made to the vice president, though to neither the vice president nor the bank was any explanation made about the interest feature of the transaction. He assured the directors that the note was good. This explanation satisfied the board, and they passed the note. One Jacob Reisch, a director at the time, testified on the witness stand, however, that some short time after the execution

of this note the vice president told him what he had learned about the matter, and said to him that the money was used in the mayor's race. This latter statement the vice president denied having made. We quote from the bill of exceptions the following statement:

"There was also evidence tending to show that J. M. McKnight was president of the bank, and the other officers of the bank, including the directory, had entire confidence in his honesty and integrity up to the time the bank was closed; that none of them had any knowledge that any act of his, in the management of said bank, was fraudulent or dishonest, until after the closing of the bank; that said bank had a discount committee who regularly examined and passed on the papers of the bank, as required of such committee, and the directory of said bank undertook to make a monthly investigation, sometimes twice a month, of the affairs of said bank, and required the president to go through same with them and make a full report thereon; that some of the directors were in the bank almost daily inspecting its affairs, and that they did at all times observe due and customary supervision over said president for the prevention of default; that none of the officers of said bank, including the directory, had any knowledge of the various checks set up in the petition as fraudulent, and that were charged to the account of other parties than those drawing them, or on whom they were drawn, except the clerks who charged them up to said account as stated, and there was evidence tending to show that they charged them up to such accounts by the direction of McKnight, the president, and except, further, R. E. Reutlinger, the cashier and teller of said bank, knew of said checks when they came into said bank and was instructed to hold them as cash items by McKnight, but further than this he had no knowledge of them."

Now, with this state of the record in mind, we come to consider the statements in the certificate signed by the cashier, on May 29, 1896, in answer to the letter of the surety company, shortly before the bond was renewed, to determine whether prejudicial error arose from rejecting the certificate. The certificate stated that the president "has performed his duties in

an acceptable and satisfactory manner, and we know of no reason why the guarantee bond should not be continued." There was certainly proof showing that the action of the president as to the three checks, and the charging them to accounts on the books of the bank, deceived the officers of the bank and caused them to be satisfied with the transactions. Certainly also there was uncontradicted evidence establishing that the explanation given by McKnight of the discount of the two thousand dollar note satisfied the directors. There was no justification in the evidence on these subjects to take the case from the jury and instruct a verdict for the defendant upon the theory that in and of themselves the transactions were of such a character as to preclude the possibility of a belief in the sufficiency of the explanation made by the president, however apparently reasonable those explanations may have been and however honest may have been the belief in their truth. This being so, it follows that the only basis upon which it could have been found that the bank was dissatisfied was the deduction from the facts and circumstances that the bank knew of the fraud which the transactions were intended to effectuate. And this latter view was stated by the court to the jury. Referring to the alleged fraudulent checks and drafts of the president, the court said:

"The mere fact of drawing for more than you have got in the bank without any fraudulent intent in that mere transaction would hardly be a fraudulent act within the meaning of this bond.

"Now, I suppose in this case, if the bank had known that McKnight was making these drafts for these various fraudulent purposes, such as buying up councilmen, buying up aldermen, paying his own personal debts; if the bank had known that and consented to it, there would not have been a fraudulent act of McKnight for which the bank could recover against this company.

"But if you believe from the evidence that the bank did not know of the fraudulent purposes for which the overdrafts were made, if the overdrafts were made in connection with this matter—if you believe the bank did not know the fraudulent

purposes, then that changes the result; because if the bank did not know it and still consented to it, it would not relieve the act of McKnight from the character of being a fraudulent act. So that, as I view this case—you must remember, however, that you are the sole judges of the evidence in this case, its credibility—as I view this case, however, there would be no fraudulent acts upon McKnight's part, limiting my observations now to the overdrafts, there would be no fraudulent acts upon his part merely in an overdraft, if there were no fraudulent intent behind it which was concealed from the bank."

Again, the court—referring to the Britt and Reeder transaction—said:

"If you believe from the evidence that the bank did know of this fraudulent purpose, and that this default of McKnight's, this fraudulent act of McKnight's, in getting these two thousand dollars, was known to the bank at the time, then I instruct you that all of the liability of the defendant in this case would cease then, that being the earliest, or one of the earliest, if not the earliest, of all these transactions. If you believe from the evidence that this transaction was known and condoned by the bank at the time, before these other transactions occurred, then the defendant in this case is not liable."

In other words, reiterating in a somewhat different form the proposition previously stated if the certificate transmitted by the cashier to the surety company had been received in evidence it would not alone have availed as a defence, because further proof would have been required showing the falsity of the statements contained in the certificate. In view, however, of the uncontradicted testimony tending showing that in the course of the transactions relied upon the president had, either by conduct or explanation, produced the impression on the bank that the transactions were *bona fide*, and therefore relieved the bank from any dissatisfaction as to the transactions, it must follow that the falsity of the certificate could alone have been inferred by concluding either that the transactions in and of themselves were of such a character that as a matter of law no explanations made of them by the president could have justified the bank in being satisfied on the subject, or that the surrounding

circumstances were such as to authorize the jury to infer that the bank must have known of the fraud, and therefore to find that the bank could not possibly have been satisfied with the conduct of the president. But the first hypothesis, we have pointed out, was inadmissible. The second was left to the jury to determine, since the charge of the court was that if the jury could deduce from the proof knowledge on the part of the bank of the fraud of the president, the surety company would not be liable on the bond. As, therefore, the very question which the jury would have been called upon to determine if the certificate had been received in evidence was fully submitted to them and was necessarily negatived by their verdict, no foundation exists for holding that prejudicial error resulted from excluding the certificate.

5. The trial court erred in not instructing the jury that the knowledge possessed by an officer or director of the bank, of the fraudulent purposes of McKnight, though such knowledge had not been communicated to the bank, should be treated as the knowledge of the bank; and also erred in not instructing the jury that the knowledge which any officer or director of the bank might have acquired of the fraudulent conduct of McKnight, if such officer or director had exercised customary supervision, should be imputed to the bank.

The questions which these propositions embrace were raised by the exceptions taken to certain portions of the charge to the jury, referred to in the record as instructions Nos. 5, 6 and 7. In instruction No. 5 the court told the jury, in general terms, that the bank, under the stipulations contained in the bond, owed to the surety the duty of exercising due and customary supervision over McKnight to prevent the commission by him of fraudulent acts, and further instructed that if the bank knew of the fraudulent purposes of McKnight in connection with the drafts and checks upon which recovery was sought, the surety would not be liable. Exception was taken to this instruction, on the ground that it "did not submit correctly to the jury consideration of knowledge on the part of the officers or directors of the bank other than McKnight, which they had, or would have had, if customary supervision

had been exercised." Instruction No. 6, and the objection made to it, reads as follows :

" I do not think that the knowledge of a cashier of a bank, speaking generally, is the knowledge of the bank as to any matter that does not come within the customary or ordinary duties of a cashier or those which have been specially imposed upon him by the action of the bank. I do not think Mr. R. E. Reutlinger, in this case, in respect to any matter which he knew or could do, represented the bank, if it was outside of his ordinary duties ; and I do not recall anything that he knew, so far as the proof shows that would in anywise affect the liability of the defendant in this case."

Objection was made to the foregoing portion of the charge, on the ground that the knowledge of the cashier of the acts of McKnight in respect to his overdrafts, his transactions in connection with the $2000 note signed by the two aldermen and with the checks to Edmunds, and the several checks for Mc-Knight's individual account, was the knowledge of the bank, and that the jury should have been so told.

Instruction No. 7 dealt with the $2000 note transaction. In effect, the jury were instructed that the knowledge of the cashier acquired in the performance of his duties might be imputed to the bank, but that the vice president or an individual director did not hold such an official relation to the bank as that his knowledge of wrongdoing by McKnight, if not communicated to the bank, could be treated as the knowledge of the bank.

We do not deem it necessary to analyze the instructions given by the court for the purpose of determining whether they were in all respects accurate, because we are of the opinion that if the court in anywise erred it was in giving instructions which were more favorable to the defendant surety than was justified by the principles of law applicable to the case.

It is well settled that, in the absence of express agreement, the surety on a bond given to a corporation, conditioned for the faithful performance by an employé of his duties, is not relieved from liability for a loss within the condition of the bond by reason of the laches or neglect of the board of directors,

not amounting to fraud or bad faith, and that the acts of ordinary agents or employés of the indemnified corporation, conniving at or coöperating with the wrongful act of the bonded employé, will not be imputed to the corporation. *United States v. Kirkpatrick,* (1824) 9 Wheat. 720, 736; *Minor v. Mechanics' Bank,* (1828) 1 Pet. 46; *Taylor v. Bank of Kentucky,* (1829) 2 J. J. Marshall (Ky.), 564; *Amherst Bank v. Root,* (1841) 2 Metcalf, 522; *Louisiana State Bank v. Ledoux,* (1848) 3 La. Ann. 674; *Pittsburg, Fort Wayne & Chicago Ry. Co. v. Shaeffer,* (1868) 59 Penn. St. 350, 356; *Atlas Bank v. Brownell,* (1869) 9 Rhode Island, 168. The doctrine of these cases is thus epitomized in 59 Penn. St. 357:

" Corporations can act only by officers and agents. They do not guaranty to the sureties of one officer the fidelity of the others. The rules and regulations which they may establish in regard to periodical returns and payments are for their own security, and not for the benefit of the sureties. The sureties, by executing the bond, became responsible for the fidelity of their principal. It is no collateral engagement into which they enter, dependent on some contingency or condition different from the engagement of their principal. They become joint obligors with him in the same bond, and with the same condition underwritten. The fact that there were other unfaithful officers and agents of the corporation, who knew and connived at his infidelity, ought not in reason, and does not in law or equity, relieve them from their responsibility for him. They undertake that he shall be honest, though all around him are rogues. Were the rule different, by a conspiracy between the officers of a bank or other moneyed institution, all their sureties might be discharged. It is impossible that a doctrine leading to such consequences can be sound. In a suit by a bank against a surety on the cashier's bond, a plea that the cashier's defalcation was known to and connived at by the officers of the bank, was held to be no defence. *Taylor v. Bank of Kentucky,* 2 J. J. Marsh. 564."

So, also, in 3 La. Ann. 674, the court, after suggesting the distinction between the knowledge of the governing body of a bank, the board of directors, of the default of a bonded em-

ployé, and the knowledge of such default by another officer or employé, not communicated to the board, thus tersely stated the applicable doctrine (p. 684):

"It cannot be said that if one servant of a bank neglects his duty, and by his carelessness permits another servant of the bank to commit a fraud, the surety of the fraudulent servant shall be thereby discharged."

And see *American Surety Co.* v. *Pauly*, 170 U. S. 156, 157, and cases cited. In other words, the principle of law discussed in the case of *The Distilled Spirits*, 11 Wall. 356, viz., that the knowledge of an agent is in law the knowledge of his principal, is intended for the protection of the other party (actually or constructively) to a transaction for and on account of the principal had with such agent. In the very nature of things, such a principle does not obtain in favor of a surety who has bonded one officer of a corporation, so as to relieve him from the obligations of his bond, by imputing to the corporation knowledge acquired by another employé subsequent to the execution of the bond, (and from negligence or wrongful motives, not disclosed to the corporation,) of a wrong committed by the official whose faithful performance of duty was guaranteed by the bond. As the rule of imputation to the principal of the knowledge of an agent does not apply to such a case, it must follow that it can only obtain as a consequence of an express provision of the contract of suretyship. Was there such a provision in the bond now under consideration?

Now the clause of the bond sued on, and as to which the court was instructing the jury in the portions of the charge under consideration, is as follows:

" 'That the employer shall observe, or cause to be observed, due and customary supervision over the employé for the prevention of default, and if the employer shall at any time during the currency of this bond condone any act or default upon the part of the employé which would give the employer the right to claim hereunder, and shall continue the employé in his service without written notice to the company, the company shall not be responsible hereunder for any default of the employé which may occur subsequent to such act or default so condoned.' "

Manifestly, this stipulation is not fairly subject to the construction that it was the intention that the neglect or omission of a minority in number of the board of directors or the neglect or omission of subordinate officers or agents of the bank should be treated as the neglect or omission of the bank. The provision is not that a minority in number of the board of directors or that subordinate officers or agents would exercise due and customary supervision, and would not condone a default of the bonded employé or retain him in his employment after the commission of a default, but the agreement is that the bank would do or not do these things. This in reason imports that the things forbidden to be done or agreed to be done were to be either done or left undone by the bank in its corporate capacity, speaking and acting through the representative agents empowered by the charter to do or not to do the things pointed out. To hold to the contrary would imply that the bond forbade the doing of an act by a person who had not power to perform or commanded performance by one who could not perform. Assuredly, therefore, the conditions embodied in the stipulation to which we have referred, both as to doing and nondoing, contemplated in the reason of things the execution of the duties which the contract imposed on the bank, either by the governing body of the bank, its board of directors, or by a superior officer, such as the president of the bank, having a general power of supervision over the business of the corporation, and vested with the authority to condone the wrongdoing or to discharge a faithless employé. That is to say, the stipulation in all its aspects undoubtedly related to the bank, acting through its board of directors or through an official who, from the nature of his duties, was in effect the vice principal of the bank. The decision in *Guarantee Co.* v. *Mechanics' &c. Co.*, 183 U. S. 402, it may be remarked, in passing, is not antagonistic to the views we have just expressed, because in that case all the information which was held imputable to the bank had been communicated to the president of the bank.

Now, applying the principles previously expounded to the case in hand, it is evident that the court rightly refused to instruct the jury that the mere knowledge of one or more direct-

ors, less than a majority of the board, and of the vice president of the bank, of the default of the president, was imputable to the bank. Indeed, as we have previously said, when the charge which the court gave is considered, it is apparent that the court went quite as far as the law warranted, in favor of the defendant, since the court instructed that knowledge acquired by the cashier in the course of the business of the bank, and not communicated by him to the board of directors, should be regarded as the knowledge of the bank.

6. The Court of Appeals erred in affirming the action of the trial court in instructing the jury that the carelessness of the directors in the management of the bank was not an issue for them to consider.

In considering the clause of the charge to the jury which provided that "due and customary supervision over the employé" should be observed "for the prevention of default," the trial court told the jury that it imported "a reasonable vigilance upon the part of the bank to prevent defaults," that is, to prevent the commission of fraudulent acts by McKnight. To instruct the jury in broad terms that if they found that the directors were careless in the management of the bank generally they should find for the defendant, could only have served to mislead. The court did not err in refusing the requested instruction.

*Judgment affirmed.*

Mr. Justice Gray and Mr. Justice Brewer did not hear the argument and took no part in the decision of this case.