## WICHITA MILL & ELEVATOR CO. v. LIBERAL ELEVATOR CO.

### (Circuit Court of Appeals, Eighth Circuit. May 10, 1917.)

### No. 4776.

1. SALES ⬅➡89—MODIFICATION OF CONTRACT BY NEW AGREEMENT.

A contract of sale of wheat for delivery during July was subject to a rule of a grain dealers' association requiring the seller, if unable to complete the contract, within the agreed limit to advise the buyer by mail, telephone, or telegraph, whereupon it should be the duty of the buyer to at once elect either to buy in, or cancel the deficit, or extend the contract to cover such deficit. On July 29th the seller advised the buyer that it would be prevented by a railroad embargo from shipping until August 2d, but would get the wheat out as soon as the railroads would receive it. On August 2d and 3d the buyer wired the seller, requesting that shipments be held up temporarily, and in a second wire that the sale be canceled. The seller in reply ignored or barely acknowledged

the request for delay, stating that it had the wheat ready to deliver as soon as the embargo was raised, and would much prefer to deliver it as soon as possible. In reply to a further request for delay and offer for cancellation, it again ignored, beyond a bare acknowledgment, the request to delay, and at no time in the correspondence ever did more than simply acknowledge receipt of such request. *Held*, that there was no acceptance of the offer to delay, so as to create a new contract, replacing the original contract; the fact that the seller did delay being caused by its absolute inability to ship by reason of the embargo, and not by its compliance with the buyer's request.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259.]

2. SALES ☞89—OPTION TO MODIFY CONTRACT—TIME FOR EXERCISE—"AT ONCE."

Within the provisions of such contract authorizing the buyer to elect at once to extend the contract, "at once" did not mean instantaneously, but with reasonable expedition under all the circumstances, and the circumstances in this connection comprehended both those in mind at the time the contract was made and those present at the time the party acted under such provision, and the contract included any conduct of the other party which would influence the action of the one required to act at once.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259.

For other definitions, see Words and Phrases, First and Second Series, At Once.]

3. SALES ☞89—OPTION TO MODIFY CONTRACT—TIME FOR EXERCISE.

An election by the buyer on August 10th and 11th to extend the contract was in time, where negotiations for cancellation of the contract, in which the seller actively participated, were in progress during the intervening time, and the buyer notified the seller that it extended the contract as soon as the seller demanded instructions as to disposition of the wheat.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259.]

4. SALES ☞89—OPTION TO MODIFY CONTRACT—VALIDITY OF EXTENSION OF TIME.

An attempted extension of the contract by the buyer was not ineffective, because it fixed no definite time to which the contract was extended, as the contract itself did not require performance upon a certain day, and any extension was intended to be of similar character, and, moreover, the seller could not be injured by an indefinite extension, as it was at liberty to deliver at any time.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259.]

5. SALES ☞418(2)—NONDELIVERY BY SELLER—DAMAGES.

As the extension was seasonably made and was within the terms of the contract, the contract was not broken by the seller until its failure to deliver within the time as extended, and the damages for its breach were to be measured as of that date, with interest from that date.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1175-1179.]

In Error to the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action by the Wichita Mill & Elevator Company against the Liberal Elevator Company. Judgment for plaintiff for an insufficient amount, and it brings error. Reversed and remanded, with instructions.

Chester I. Long, of Wichita, Kan. (Austin M. Cowan, of Wichita, Kan., on the brief), for plaintiff in error.

C. M. Williams, of Hutchinson, Kan., for defendant in error.

Before HOOK and STONE, Circuit Judges, and MUNGER, District Judge.

STONE, Circuit Judge. *Damage for Breach of Contract.* A writ of error based on alleged right of larger recovery by plaintiff below from judgment in its favor for $986.97. Tried to the court on stipulation of facts and brief undisputed oral testimony.

*The Contract.* July 14, 1914, the Liberal Elevator Company of Hutchinson, Kan., sold to the Wichita Mill & Elevator Company, of Wichita Falls, Tex., 25,000 bushels of wheat to be delivered f. o. b. Galveston, Tex., during that month subject to the following rule of the Kansas Grain Dealers' Association:

"Rule 7. *Incomplete Shipments.* When the seller finds he will not be able to complete a contract within the agreed limit, it shall be his duty to so advise the buyer by mail, telephone, or telegraph, whereupon it shall be the duty of the buyer to at once elect either to buy in or cancel the deficit, or to extend the contract to cover said deficit. Should the seller fail to notify the buyer of his, the seller's, inability to complete a contract for shipment, as in this rule above provided, the said contract shall remain in force unless and until completed, extended, bought in, or canceled."

*The Breach.* After shipping 7,055 bushels, the seller, on July 29th, informed the buyer of its inability to complete its contract in July because of a railway embargo. No further deliveries were made, and after an extended correspondence the buyer on September 3d, being refused further performance, bought in the deficit at Galveston. The suit is for the expense and price difference in buying in this deficit. Recovery was allowed by the court below on the basis of a breach on August 10th and measure of damage as of that date. The buyer claims breach on September 3d and measure of damage as of that date.

*The Railway Embargo.* Before stating the position of the parties, it will be useful to clear away a false issue which has been presented by both sides. While it has its importance as a circumstance in the consideration of other points in the case, the railway embargo as a defense is not an issue in this court. It was determined by the trial court to be no defense, and no other conclusion could sustain the judgment below. The determination on that point was in favor of plaintiff, and the case is here solely on its writ of error.

*The Controversy.* The dispute is solely as to whether the breach and measure of damage is to be taken as of August 10th or as of September 3d. It hinges on the rights of the parties under rule 7, supra, and the dealings between them from July 29th to September 3d (revealed in correspondence) as controlled by that rule. Under rule 7 the defaulting seller could not cancel the contract; the buyer could. The buyer never exercised its right to cancel under the contract, for, although negotiations for cancellation were under way at various times, they were without results. When these negotiations failed, the seller on August 10th demanded disposition orders for the grain, whereupon the buyer attempted to extend the contract. The seller refused to recognize this extension. If the extension was binding, the buyer's contention is correct; if not, that of the seller must prevail.

Was the contract extended by the buyer, so that it was in force upon September 3d? The buyer contends it was. The seller contests this

because, as it claims, (a) the original contract was replaced by a new contract; (b) whatever right of extension existed, either under the original or under the new contract, was not exercised seasonably; (c) any such right was not exercised properly, because the extension was indefinite as to time.

[1] (a) *New Contract.* The theory of the seller is that on August 2d the buyer requested that the wheat be held for a few days, to which it (seller) acceded, and from this arose a new contract. As it will be necessary, in considering the subsequent points in this case, to set out the correspondence (August 2d to August 8th) relied upon by the seller to sustain this contention, it will not be duplicated here. That correspondence shows this situation: When it began, the time for delivery under the original contract was two days past; the seller had assured the buyer five days earlier that it would be prevented by a railway embargo from shipping until August 2d, but would get the wheat out as soon as the railroads would receive it; the duration of the embargo after that date seems to have been uncertain, or at least unknown to these parties; between the above dates the embargo continued, so that the seller could not have shipped; during the same period there was a congestion at Galveston, so that the buyer did not desire shipment; that under these circumstances the buyer, in two wires reaching the seller on the same day, requested, first, that shipments be temporarily held up, and, second, that sale be canceled; that on the day of such receipt the seller wired and wrote buyer, in its wire ignoring the request to delay and stating it had the wheat to "apply on sales as soon as embargo is raised," and in its letter barely acknowledging such request and saying, in confirming its wire, that it had the wheat "ready to apply as soon as the Galveston embargo is raised," and "would very much prefer to deliver this wheat to you as soon as it is possible for us to do so"; that on August 4th the buyer again wired request for delay and offer for cancellation at stated price; that to this the seller replied, again ignoring, beyond bare acknowledgment, the request to delay, and saying it had the wheat stored in its elevator "ready to ship any time, consequently would not feel like giving you any money to cancel this sale"; that at no time did the seller in its correspondence ever refer to such request for delay, except to simply acknowledge its receipt. This reveals no acceptance of the offer, if such it was, to delay. Nor can the fact that the seller did delay be of any force in this connection, for such delay was caused by its absolute inability to ship, and not by its compliance with the buyer's request. There was no new contract.

[2] (b) *Seasonable Extension of Contract.* The buyer was notified at Wichita Falls, Tex., by letter mailed at Hutchinson, Kan., July 29th, that the seller would be unable to complete its contract within the contract time. No extension by the buyer under the contract (rule 7) was attempted until August 10th and 11th. Had the right of extension expired before that time? Rule 7 provided that, upon notification from the seller of his inability to complete contract within time limit, it (buyer) should "at once elect to buy in or cancel the deficit, or to extend the contract to cover said deficit." Was this election exercised "at once" within the meaning of the contract?

"At once" does not mean instantaneously, but with reasonable ex-

pedition under all of the circumstances. 5 C. J. 1439, and citations; Fidelity & Deposit Co. v. Courtney, 186 U. S. 342, 22 Sup. Ct. 833, 46 L. Ed. 1193; Empire State Surety Co. v. Northwest Lumber Co., 203 Fed. 417, 121 C. C. A. 527 (9th C. C. A.). Each case must necessarily rest largely upon its own facts; therefore authorities are usually of little aid. However, this much may be gained from them: The "circumstances" comprehend both those in mind at the time the contract is made and also those present at the time the party acts under such provision of the contract (see above citations); and it has been held that in the latter class is included any conduct of the other party to the contract which would influence the action of the one who must act "at once." McCormick Harvesting Mach. Co. v. Warfield, 33 App. Div. 513, 53 N. Y. Supp. 737 (3 months' delay); Bennett v. Ins. Co., 67 N. Y. 274 (26 days' delay). Also see Peterson v. Hansen, 15 N. D. 198, 107 N. W. 528.

What were the "circumstances" attending the election by the buyer to extend this contract? They are revealed in the communications between the parties from July 29th to August 14th, inclusive. Such parts of the correspondence as bear upon all questions in the case are quoted below in the margin.[1]

[1] Up to July 29th the seller had delivered 7,055 bushels. On that date it wrote: "Yesterday morning the Santa Fé and Rock Island roads advised us that they had declared an embargo on Galveston until August 2d, which of course will prevent us shipping any wheat until that date. We assure you that we will get this wheat out the earliest moment that the railroads will receive same."

August 2d, night wire from buyer: "Account unusual congestion please hold wheat purchased from you for further instructions."

August 3d, wire from buyer: "Wire best cancellation offer wheat bought from you. Markets firmer to-day but Galveston congested."

August 3d, wire from seller: "Have the wheat bought and in our elevators ready to apply on sale as soon as embargo is raised. Would prefer to deliver the wheat, if however you wish to cancel wire your idea as to terms."

Same date, letter from seller: "We are in receipt of your night telegram of the 2d, asking us to hold back wheat sold to you for further instructions. We are also in receipt of your message later in the day asking us to wire best cancellation offer on the wheat sold to you. We note that you state in your letter [wire] that markets are firmer, but Galveston is congested. * * * We have just wired you that we have the wheat bought and in the elevator ready to apply as soon as the Galveston embargo is raised. We also stated to you that we would very much prefer to deliver this wheat to you as soon as it is possible for us to do so. If you decide to cancel this sale, please wire us your idea as to terms. We would not care to cancel unless we could cancel on terms satisfactory to us and as soon as we hear from you will take the matter up with you again."

August 4th, wire from buyer: "Will appreciate holding wheat few days 86 Galveston best cancellation offer. Reply must reach us by ten to-day."

Same date, letter from seller: "We are also in receipt of your message a little later stating that you would appreciate, if we would hold the wheat a few days we have sold to you. We note that 86¢ Galveston is the best cancellation you can make at this time. Beg to state that we have this wheat bought, and stored in our elevator ready to ship at any time, consequently would not feel like giving you any money to cancel this sale."

August 8th, letter from seller (after referring to correspondence concerning other matters): "Every one has a good deal of wheat sold to exporters to go to Galveston, and have this wheat on hand and are unable to deliver it

[3] From this correspondence we form these conclusions: That the parties at all times regarded the contract in existence; that the occasion for the exercise of the buyer's option arose on the receipt of the seller's letter of July 29th; that at that time the delay, as stated by the seller, would be only for two or three days; that when it developed there would be longer delay of uncertain duration the parties began negotiations for cancellation; that failure of those negotiations finally resulted in the request from the seller for disposition; that this request resulted in the communications upon that same day, the day following, and four days later, extending the contract under the buyer's election therein. The contract gave the buyer the absolute right to extend the contract if it acted promptly. If there was here any delay, it resulted from causes actively participated in by the seller. It was its (seller's) assurance of the very brief delay of two days over the contract time that would have made an immediate election under the contract by the buyer unnecessary. Beginning with the end of that period, it was an active party in attempting to arrange some amicable

on account of embargo. We believe that unless some change occurs in the situation, that the dealers in this territory will have to take some action in order to realize on their wheat."

August 10th, wire from seller: "We are holding eighteen thousand wheat drawing demurrage time shipment expired cannot hold longer wire disposition or basis of cancellation."

Same date, wire from buyer: "Ship our wheat Galveston Texas care Star Mills. * * *"

Same date, wire from seller: "You know there is embargo on Galveston if you cannot furnish other disposition we consider sale canceled now."

Same date, letter from seller: "We wire you this morning that we are holding 18,000 bushels of wheat drawing demurrage, the time of shipment has expired, cannot hold longer. Wire disposition or basis of cancellation. We have your wire in reply saying, Ship our wheat to Galveston Texas care Star Mills. You know there is an embargo on Galveston. This wheat cannot be shipped to Galveston, not now or possibly not two or three months from now. We thought possibly by wiring you that you could give some other disposition of this wheat and place it where there is no embargo, as other people have been doing when it was out of date. If you had not asked us to hold this wheat a little, we could have worked it out to you at that time, but of course now we could not do it. In reply to your wire we wired you. You know there is embargo on Galveston and if you cannot furnish other disposition we consider sale canceled. Now we certainly do not like to do this, but it is a matter of compulsion with us, as we cannot afford to keep it here on track paying demurrage and we are compelled to get action on the money we have invested in it. If you can see anything different in this matter aside from the unsatisfactory message you wired us, we will be pleased to do our part with you. Other people that have had stuff bought from us, also other dealers to go to Galveston or New Orleans, and it could not be billed to them there, have made other disposition of it. We want to fill our contracts. We cannot hold this wheat indefinitely for you."

Same date, wire from buyer: "Sorry bought for Galveston ordered to Galveston. Will extend contract until further notice, but cannot agree to cancellation wheat sold."

August 11th, letter from buyer: "We beg to confirm our exchange of message with you this afternoon relative to a batch of wheat bought from you going to Galveston. We are a little surprised that you should suggest the position you have in your message. This wheat was bought for Galveston and ordered to Galveston, and we must ask that you ship same to Galveston, as we are unwilling to agree to cancellation, as we have the wheat sold and must have

adjustment of the situation which would have made any extension use-
less. Those negotiations were not in accord with any powers given by
the contract, but were commendable efforts to arrive at a mutually
satisfactory solution of the difficulty. Promptly upon their failure the
buyer exercised its election to extend the contract. Under these cir-
cumstances it acted within the terms of the contract.

[4] (c) *Proper Extension under Contract.* The seller claims that
the attempted extension of the contract was not of the character al-
lowed by the contract, since it was entirely indefinite as to time. It is
true that the buyer, in making its extension, did not designate any cer-
tain date for its termination. Respecting this power of extension, the
contract could hardly be broader than it is. It does no more than set
out the condition which authorizes the exercise of the right and the re-
quirement that it be then exercised promptly.

Ordinarily, where time of contract performance is limited, a failure

it shipped, and you have no right to refuse to follow the instructions as
agreed in our exchange of telegrams."

Same date, another letter from buyer: "We are in receipt of your letter of
the 10th. * * * Inasmuch as we have this wheat sold to go to Galveston
for export, we would not be able to tender ladings showing destination at some
other point, therefore, we would be unable to accept other ladings until some
satisfactory arrangements could be made. We are willing to grant an in-
definite extension of the contract until further notice. We, ourselves, have a
great deal of wheat here still tied up on the tracks, which we wish to go to
Galveston, and which we will be unable to ship until the embargo has been
removed."

August 13th, wire from buyer: "Will cancel balance our Galveston contract
95¢ export. Answer by wire immediately.'"

Same date letter from seller: "We are in receipt of your favor of the 11th and
note fully what you have to say. Also your message this morning, stating
that you will cancel balance of your wheat, your Galveston contract with
us at 95¢ export. We also note that you understand that Chicago is bidding
relatively no more. We did not answer by wire as your proposition is entirely
out of line. * * * All of the other exporters of Chicago and Kansas City,
as well as St. Louis, to whom we had wheat sold on Galveston terms, are now
giving us either Kansas City or Chicago billing on this wheat. These billing
orders are all on wheat which was to be shipped either during August or
September. Our contract with you, however, expired August 1st. Our attor-
ney advises us that contracts of this character cannot be extended by one
party, without the consent of the other. It would be a different proposition if
we did not have the wheat ready to deliver. By extending the time for
us, you would cause us an injury, as we have this wheat on hand, and are
compelled at this time to ship it some place in order to realize on it, as we are
blocked up with wheat and need the money."

August 14th, letter from buyer: "Yours of the 13th. We suggest that you get
you another attorney. We have not canceled your contract and you are at
liberty at all times, in case you could not hold the wheat longer, to ship it in
accordance with our original instructions. We wired you on August 1st [2d],
asking you to please hold up the shipments for further instructions, on
account of the congested conditions, but we have not canceled the contract, nor
have we turned down any of your drafts. The buyer has the right to extend
the time without the consent of the seller, although it is optional with the
seller whether he accepts the extension or not, however, it is optional with
the buyer, in case the contract has expired, to extend, buy in, or cancel. We
have elected to extend the time and will thank you to make the shipments in
accordance with the original instructions unless we agree to the contrary
later."

to complete within the period is a finished breach, with its attendant damage liability. However, this contract provided that the buyer might elect to waive the breach and extend the time for performance. The position of the seller regarding this contention is based upon a misconception of the meaning of the contract. This is not a contract where performance must be upon a certain day. If it were, the seller might be correct in its contention. But this contract provided for delivery during *any* day of July after its execution. Any extension under the contract was intended by it to be of similar character. This contract, by "extension," means not the fixing of a definite future date upon which delivery must be made, but an additional period during every day of which the seller may make delivery. In no way can the seller be injured by an extension; nor by an indefinite extension, because every day of the extension is an additional opportunity, uncontrolled by the buyer, for it to perform its contract. The buyer does not have to grant any extension; it can claim the advantage of the breach caused by the seller. If it does extend, it can be for as short or as long a period as it may elect. If it chooses to set a definite date, that simply marks the end of the extension, and limits the time within which the seller must deliver. It is obvious that, if the delivery continues in default, the buyer would ultimately have to prescribe a definite date for terminating the extension. But there is no requirement in the terms of the contract, as expressed or as implied by law, to require such date to be determined at the time the extension is granted, and the seller may on any day terminate the extension by full performance.

In this case the buyer was eminently fair concerning this extension. More than once the seller expressed its willingness and desire to deliver as soon as the embargo would permit. In the midst of the embargo, when apparently neither party could estimate its duration, the buyer granted an indefinite extension until further notice at a time when it wanted the wheat as soon as it could get it. From that time on it stated the seller was "at liberty at all times" to deliver. In giving its "further notice" it was entirely reasonable. As soon as the embargo was lifted, and delivery made possible, the buyer repeatedly (from August 28th to September 2d) by wire requested delivery. Its requests were not even acknowledged. Finally, upon September 3d, it wired:

"Will extend your contract until September 15th, providing you wire us you will ship wheat. Otherwise please wire authority buy for your account. Must have definite understanding immediately."

Seller ignoring this, the buyer on same date again wired:

"Account your failure to respond to our wires, will buy best advantage for your account wheat due us."

To which, same date, seller wired:

"We consider contract to ship additional wheat canceled will not agree to extension of contract will not authorize you to buy for our account we are under no obligation to take any further steps in the matter."

Whereupon the buyer went into the market and bought grain, with the resulting loss here in suit.

[5] The extension was seasonably made, it was within the terms of the contract, it has been fairly acted upon by the buyer, the contract was breached by the seller on September 3d, and the measure of damage was of that date.

The judgment should be reversed and remanded. with instructions to enter judgment for plaintiff on the merits for $6,359.50 and interest thereon from the 3d day of September, 1914.