KENDRICK-ROAN GRAIN & ELEVATOR CO. *et al. v.* WEAVER
*et al.*

(*Nashville.* December Term, 1913.)

1. **PRINCIPAL AND SURETY.** Fidelity· bond. Warehouse
superintendent. Fund.

A corporation operating a grain warehouse, desiring to borrow
money from a bank on warehouse receipts, appointed W., who,
in fact, was a mere bookkeeper for the corporation, superin-
tendent of the warehouse, and procured a fidelity bond from
defendant surety company guaranteeing against loss arising
from W.'s fraud in issuing warehouse receipts without having
the grain in store. The bond contained a rider that it should
not cover any loss except such as might grow out of the issu-
ing of fraudulent receipts signed by W. in conjunction with an
officer of the warehouse company, and only such receipts as
should be pledged to complainant bank as collateral in the
regular course of its business. *Held,* that, where W. executed
receipts in conjuction with the president of the warehouse com-
pany for grain in excess of that stored, which receipts were
thereupon pledged to the bank, W. thereby certified to· a fact
as of his own knowledge, and was guilty of fraud within the
rider of the bond, though he had no actual knowledge of the
falsity of the receipts, and though he, in fact, was not the super-
intendent of the warehouse, and performed no duties pertaining
to such office. (*Post, pp.* 612-625.)

Cases cited and approved: Dawe v. Morris, 4 L. R. A., 158, 159;
Bullitt v. Farrar, 42 Minn., 8; Hedlin v. Minneapolis Medical &
Surgical Institute, 35 L. R. A., 430, 431; Andrews v. Jackson, 168
Mass., 266; Fargo Gas Light & Coke Co. v. Fargo Gas & Elec-
tric Co., 4 N. D., 219; Hindman v. First National Bank, 112 Fed.
931; Shacklett v. Bickford, 74 N. H., 57; Aldrich v. Scribner,
154 Mich., 23; Morrow v. Bonebrake, 84 Kan., 724; Martin v.
Hutton, 90 Neb., 34; Westerman v. Corder, 86 Kan., 239. ·

128 Tenn. 39

Grain Co. v. Weaver.

2. **PRINCIPAL AND SURETY.** Fidelity bond. Conditions. Performance by employer. Omission. Rights of third persons.

Where a surety company executed a fidelity bond for the benefit of a bank, insuring against loss sustained by the issuance of fraudulent warehouse receipts by the alleged superintendent of a warehouse, which might be pledged by the warehouse company to the bank, the fact that the warehouse company misrepresented the employee's position as warehouse superintendent, when, in fact, he was a mere bookkeeper, and that the warehouse company failed to inform the surety of the employee's default, etc., did not relieve the surety from liability for such defaults to the bank; the bank being under no obligation to the surety company to see that such conditions of the bond were complied with. (*Post, pp.* 627, 628, 629, 630, 631, 632.)

Cases cited and approved: American Surety Co. v. Pauly, 170 U. S., 133; Fidelity & Deposit Co. v. Courtney, 186 U. S., 342; Wells Fargo & Co. v. Walker, 9 N. M., 456; Carrollton Furniture Co. v. American Credit Indemnity Co., 124 Fed. 27; Hormel v. American Bonding Co., 112 Minn., 288; People, ex rel., Casson v. Rose, 174 Ill., 310.

3. **PRINCIPAL AND SURETY.** Fidelity bond. Extent of liability.

Where a bond secured plaintiff bank against the issuance of fraudulent warehouse receipts by the superintendent of a warehouse in so far as such receipts might be pledged by the warehouse company to the bank, and receipts issued by the superintendent for an amount of grain in excess of that deposited were pledged to the bank, the surety's liability on the bond was the difference between the value of the grain called for by the receipts and the value of the amount actually stored under each of them at the time they were issued. (*Post, pp.* 632, 633.)

Cases cited and approved: Hindman v. First National Bank, 112 Fed. 931; McDonald v. Unaka Timber Co., 88 Tenn., 38; Paragon Refining Co. v. Lee Bros., 98 Tenn., 643; Cole .v. Zucarello, 104 Tenn., 64.

Grain Co. v. Weaver.

4. **PRINCIPAL AND SURETY.** Fidelity bond. Warehouse receipts. Pledge.

Where a warehouseman's superintendent was bonded to secure a bank against fraudulent warehouse receipts that might be pledged to it to secure loans to the warehouse company, and fraudulent receipts were issued for more grain than was deposited under them, which receipts were pledged to the bank, it was not material, either to the surety's liability, or to the bank's right to recover under the bond, that the warehouse company, after pledging the receipts, disposed of all of the grain covered thereby. (*Post, pp.* 633, 634.)

5. **PRINCIPAL AND SURETY.** Fidelity bond. Loss. Failure to pay. Penalty.

Where, in an action on a fidelity bond, it appeared that the surety interposed its defense in good faith, and the construction of the policy as a whole presented a matter of some difficulty, the surety company, though ultimately found liable, was not subject to the penalty imposed by Acts 1901, ch. 141, on insurers for refusal to pay a loss within 60 days after demand, etc., unless such refusal shall have been in good faith. (*Post, pp.* 634, 635.)

Acts cited and approved: Acts 1901, ch. 141.

Case cited and approved: Continental Fire Ins. Co. v. Whitaker & Dillard, 112 Tenn., 168.

FROM DAVIDSON.

Appeal from Chancery Court, Davidson County.— Jno. Allison, Chancellor.

Stokes & Stokes, P. D. Maddin, and C. T. Boyd, for appellant.

T. M. Steger and Cherry & Steger, for appellees.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The responsible defendant in this case is the National Surety Company; Weaver being financially unable to respond to the liability charged. The real complainant is the Fourth National Bank.

The bill was filed for the purpose of holding J. H. Weaver and the National Surety Company for a loss of $40,000, alleged to have been sustained by the Fourth National Bank of Nashville, Tenn., by reason of certain alleged fraudulent conduct of Weaver.

Weaver was bonded as superintendent of the Kendrick-Roan Grain & Elevator Company's warehouse. The bond is in the usual form; the contracting parties on the face of it being Joseph H. Weaver, as principal, and the National Surety Company as surety, and Kendrick-Roan Grain & Elevator Company as obligee.

It designated Kendrick-Roan Grain & Elevator Company as the employer, and Joseph H. Weaver as the employee; recited that the employer had appointed the employee to the office or position of superintendent of its warehouse at Nashville, Tenn., that the employer required security as indemnity against loss on account of the personal dishonesty amounting to larceny or embezzlement of the employee in the performance of his duties in the position referred to; engaged that the surety company, "subject to the conditions and provisons herein contained, which shall be conditions precedent to the right of the employer to recover un-

der this bond," would, on the furnishing of satisfactory proof of loss, make good to the employer any loss sustained by it "by or through the personal dishonesty amounting to larceny or embezzlement of the employee, and for which the employee shall be legally liable to the employer," occurring between January 22, 1909, and January 22, 1910.

The bond provided under paragraph second that it should be the duty of the employer to communicate to the surety company "any act, fact, or information tending to indicate that the employee is or may be unreliable, deceitful, dishonest, or unworthy of confidence, or intemperate, or gambling, or indulging in other vices;" that, in case the employer should fail in this regard, the surety company would not be liable for any act of the employee thereafter committed.

The fifth paragraph contained the provision that, if the employee should cease to act in the position to which he had been appointed in the service of the employer, the surety company should not thereafter be liable; the eighth, that all written statements and declarations concerning the employee or his duties or accounts made to the surety company by the employer were to be treated as being the basis of the bond, also that the bond was entered into on condition that the business of the employer should continue to be conducted, and the duties of the employee should remain, in accordance with the written statements made by the employer to the company relative thereto, and that, if during the continuance of the bond any circumstances

should occur or change should be made which would have the effect of making the actual facts differ from such statements without immediate written notice thereof to the surety company, and the procurement of its consent, the latter should not thereafter be liable; tenth, that the employee should be liable to the surety company for any loss which it had been required to pay to the employer; fifteenth, that the receipt and retention of the bond, or the making claim for any loss thereunder by the employer, should be taken and held as a covenant on its part, "consenting and agreeing to all the terms, provisions, and conditions herein contained," and that the employer would make frequent audits and examinations. The eighteenth was also upon the subject of audits, but referred only to a case where the employee was acting for more than one principal.

The amount of the bond was fixed at $40,000.

There was a rider attached in the following language:

"There shall be no liability on this bond in respect of any loss except such as may grow out of the issuing of fraudulent warehouse receipts, and it is specifically conditioned by the surety that the only warehouse receipts referred to are such as may be signed by the employee as warehouseman in conjunction with an officer of the employer; that there shall not be outstanding at any one time more than forty thousand dollars ($40,000), face value, of such receipts, and only those of such receipts are referred to and covered

hereby as shall be pledged with the Fourth National Bank of Nashville, Tenn., as collateral in the regular course of business of said bank.''

The bond was signed by Joseph H. Weaver and the National Surety Company. The rider was signed by the National Surety Company only.

The other provisions of the bond have no bearing on the present litigation.

In order to a proper understanding of the controversy, it is necessary to state that Kendrick-Roan Grain & Elevator Company (hereinafter called the Kendrick Company) had obtained a line of credit covering $20,000 with the Fourth National Bank, on a bond executed on the 1st of February, 1909. This bond had a rider expressed in the same language, except only as to the amount involved. The origin of that bond was this: The Kendrick Company was engaged in buying and selling grain, and had borrowed, from time to time, large sums of money from the bank on in-coming grain, covered by bills of lading, on the difference between the value at which the grain had been purchased and its value in the Nashville market; the bank holding the bills of lading as security for such value, in addition to the sums paid to the consignors. The Kendrick Company, desiring to use as a basis of credit the grains which they had purchased, and desiring to change their former method of business from dealing through the ordinary public bonded warehouses, conceived the thought of building a warehouse of their own, and installing therein a bonded superintendent

for the purpose of enabling them to use, through the medium of warehouse receipts as a basis of credit, the grain which they might hold in store. The bank agreed to handle these warehouse receipts on condition that it should be secured by a rider in the form appearing at the foot of the foregoing bond. In its letter to the agent of the surety company the bank explained its purpose, and what was meant by the word "fraudulent," in the following language: "In explanation of the situation, I would state that it is not the desire or purpose of the grain dealers referred to to do a general warehouse business, and issue negotiable receipts to such parties as may wish to store grain with them, and the object desired to be accomplished is that they may be in a position to handle their own receipts with this bank, to be pledged against money borrowed." The letter then sketches the substance of the rider with expressions of opinion as to the smallness of the risk which the surety company would thereby assume, and continues:

"As protection of this bank, we would wish your bond to state that you guarantee the warehouse against fraud and dishonesty; the purpose of this clause being that this bank shall know absolutely that it is protected against the issuance of any receipts behind which there might possibly not be the grain called for.

"All receipts to be issued under the conditions above stated must have the signatures of both the warehouseman and an officer of the company, and under the ar-

rangement proposed it seems to me your liability is very limited, especially in view of the fact that the company issuing the receipts would be responsible to you in the event of fraud, and, as the limit of any one company is $20,000, face value and receipts, I apprehend your risk would be practically a minimum."

The $20,000 bond with its rider was executed; the language of that bond being, as already stated, the same as the present bond, save the difference in the amounts.

Subsequently the Kendrick Company desired to increase its line of credit available by warehouse receipts to the extent of $40,000, and the bond sued on was accordingly executed, and, as perceived from our summary of the bond, it was made to cover the period from 22d of January, 1909, to 22d of January, 1910, antedating the prior bond.

While the $20,000 bond was in force, and before the execution of the bond sued on, $30,000 was borrowed on the warehouse receipts, the remaining $10,000 of the whole $40,000 having been borrowed after the execution of the present bond; but this bond reached back, as shown in the last paragraph, so as to embrace the period of both bonds, and to cover the whole sum. It is insisted that the defendant surety company was deceived as to the existence of this $10,000 in excess of the $20,000 bond; but there is nothing in the record to show such fact. The sums borrowed were as follows:

"February 1, 1909, $4,000, with warehouse receipt as collateral calling for 10,000 bushels No. 3 white

oats; February 2, 1909, $4,000, with warehouse receipt as collateral calling for 10,000 bushels No. 2 white oats; February 2, 1909, $6,000, with warehouse receipt as collateral calling for 10,000 bushels No. 2 mixed corn; February 2, 1909, $5,000, with warehouse receipt as collateral calling for 8,500 bushels No. 2 mixed corn; February 2, 1909, $5,000, with warehouse receipt as collateral calling for 8,500 bushels No. 2 mixed corn; February 3, 1909, $6,000, with warehouse receipt as collateral calling for 10,000 bushels No. 2 mixed corn; March 13, 1909, $2,250, with warehouse receipt as collateral calling for $5,000 bushels No. 2 mixed oats; March 13, 1909; $2,250, with warehouse receipt as collateral calling for 5,000 bushels No. 2 mixed oats; March 13, 1909, $2,250, with warehouse receipt as collateral calling for 5,000 bushels No. 2 mixed oats; March 13, 1909, $2,250, with warehouse receipt as collateral calling for 5,000 bushels No. 2 white oats; March 25, 1909, $1,000, with warehouse receipt as collateral calling for 2,250 bushels No. 2 white oats.''

All of the notes were demand notes. The business ran along until some time in July, 1909, when the Kendrick Company failed. The bank then demanded the grain on the collateral; but there was no grain to meet the liability, it all having been shipped out by the Kendrick Company. The present suit was then brought on the bond.

All of the notes were signed by the Kendrick Company, and each of them distinctly pledged the amount of grain described in the warehouse receipt attached

thereto.   A copy of one of these warehouse receipts
will suffice as an illustration of all, viz.:

"Nashville, Tenn., Feb. 2, 1909.
"No. 3.                    Quantity 560,000 pounds.

"Received and stored in Kendrick-Roan Grain &
Elevator Company's warehouse 10,000 bushels of No.
2 mixed corn, weighing 560,000 pounds.

"This commodity will be delivered only upon the
return of this receipt properly indorsed.   No ware-
house charges are to accrue against this receipt.

"[Signed]   J. H. WEAVER,

"Superintendent of Warehouse."

Countersigned:

"M. K. KENDRICK,

"President and General Manager."

Indorsed:

"M. K. KENDRICK,

"President and General Manager."

All the receipts were signed by Weaver, as ware-
houseman, in conjunction with M. K. Kendrick, presi-
dent, in the manner above shown, and the amount is-
sued was $40,000 face value, and none were issued ex-
cept such as were pledged to the Fourth National
Bank of Nashville, Tenn., in the regular course of its
business.   So it is perceived that the terms of the rider
were complied with, unless the receipts were fraudu-
lently issued; that is, issued without grain to cover
them.

On this subject, the bill alleges:

"That said warehouse receipts were false and fraudulent, and in furtherance thereof would show to the court that on February 22, 1909, two warehouse receipts were isused by defendant J. H. Weaver which were deposited with the complainant Fourth National Bank as collateral security for loans that they made as hereinbefore set out, each of said receipts calling for 8,500 bushels of white corn, making a total of 17,000 bushels; that on the date there was not in the possession of the said warehouseman, and subject to receipt therefor, 17,000 bushels of white corn; that, as a matter of fact, there were only in the warehouse at that time 7,371 29/56 bushels of white corn; that on the same date, viz., February 2, 1909, defendant Weaver, as warehouseman, issued two receipts calling for 10,-000 bushels each, or 20,000 bushels in all, of No. 3 white oats, which warehouse receipts were deposited with the complainant Fourth National Bank as collateral security for loans that day made as hereinbefore set out; that on that date there were not 20,000 bushels of No. 3 white oats in said warehouse, and subject to warehouse receipt therefor; that, as a matter of fact, there was in said warehouse on said date only 1,870 10/32 bushels of white oats; that on the same date, viz., February 2, 1909, the warehouseman issued a receipt calling for 10,000 bushels of No. 2 mixed corn, which receipt was deposited with the complainant Fourth National Bank as collateral security for a loan that day made as hereinbefore set out; that at that time there was no mixed corn in the warehouse, and

subject to warehouse receipt therefor; that on February 3, 1909, defendant Weaver, as warehouseman, issued a receipt calling for 10,000 bushels of No. 2 mixed corn, which receipt was deposited with the complainant Fourth National Bank as collateral security for a loan that day made as hereinbefore set out; that at that time there was no mixed corn in the possession of said warehouseman, and subject to a receipt therefor; that on March 13, 1909, defendant Weaver, as warehouseman, issued a receipt for 5,000 bushels of No. 2 white oats, which receipt was deposited with the complainant Fourth National Bank as collateral security for a loan that day made as hereinbefore set out; that at that time there were no white oats in the possession of said warehouseman, and subject to a receipt therefor; that on the same date, viz., March 13, 1909, the warehouseman, defendant Weaver, issued three receipts for 5,000 bushels each, or 15,000 bushels in all, calling for No. 2 mixed oats, which receipts were deposited with the complainant Fourth National Bank as collateral security for loans that day made as hereinbefore set out; that at that time there was not 15,000 bushels of No. 2 mixed oats in the possession of said warehouseman, and subject to a receipt therefor; that, as a matter of fact, on that date there were only 5,690 15/32 bushels of mixed oats; that on March 25, 1909, defendant Weaver, as warehouseman, issued a receipt calling for 2,250 bushels of No. 2 white oats, which receipt was deposited with the complainant Fourth National Bank as collateral security for a loan

that day made as hereinbefore set out; that at that time there were no white oats in the possession of said warehouseman, and subject to a receipt therefor; that all of said warehouse receipts issued as aforesaid and for the purposes aforesaid were false and fraudulent, excepting, possibly, one receipt for 5,000 bushels of No. 2 mixed oats out of three for the same number of bushels that were issued on the 13th day of March, 1909, and hereinbefore fully described.''

These allegations of the bill are sustained by the evidence. The amount of grain found on hand on the several dates mentioned in the excerpt from the bill were ascertained by a careful examination of the books of the Kendrick Company by an expert, and they are not denied on the record.

It follows that, nothing else appearing, the said J. H. Weaver fraudulently issued the warehouse receipts within the sense and meaning of the rider, as it was understood through the correspondence between the parties which we have cited supra.

As to whether this fraud would make the surety company liable for the full value of the grain represented in the several receipts, or only for the deficiency between the amount represented and that actually on hand, we shall hereinafter state our conclusion.

It is insisted on the part of the surety company, however, that Weaver was not guilty of any fraud at all. The contention upon this subject is as follows: That, while Weaver was mentioned as superintendent of the warehouse, and was so bonded, he never in fact

acted in that capacity, but was only a bookkeeper of the Kendrick Company; that the employee who stayed at the warehouse, and attended to the receiving and shipping of grain, and looked after the warehouse, was one Kendrick Goode, a nephew of the president of the company; that the president made daily visits to the warehouse, which was about 150 yards from the office where Weaver stayed, and sometimes made three or four visits a day; that Kendrick Goode made reports to the office daily as to the amount of grain in store of the different kinds; that from these reports Weaver and Kendrick, the president, filled the blanks in the warehouse receipts, and Weaver then signed the receipts as warehouseman; that he never, in fact, had any actual knowledge as to whether the reports made by Kendrick Goode were true reports, but always supposed and believed they were true.

The record substantiates this contention as to the actual things which were done by Weaver, and by Kendrick and Kendrick Goode. It should be added, however, that the record further shows that, when Weaver filled in the blanks showing the amount of grain on hand, and signed the warehouse receipts, he attached these receipts to the demand notes, and he knew that they were to be used by the Kendrick Company in obtaining money by the hypothecation thereof. It should further be stated that the bank had no knowledge other than that Weaver was honestly performing the duties belonging to the office of superintendent of the warehouse, and it had no knowledge of any defi-

ciency in the amounts of grain certified. It relied fully on these receipts as stating the truth, and advanced the money on the faith and credit thereof.

It is insisted by the defendant, as matter of law, that, inasmuch as Weaver believed that the grain was on hand as certified to in the receipts, and had no actual purpose of defrauding the bank, he was not guilty of any fraud. Numerous authorities are cited for the purpose of sustaining this proposition. We shall not undertake to discuss these authorities in detail, but only state our conception of the law, which is that one is guilty of a gross fraud who certifies to a fact without knowing whether it is true or false, in violation of his official duty to know the existence of such fact, and who knows that his certificate is to be acted on by another who will advance money in reliance thereon, in ignorance of the fact that the certifying party has not discharged the duty incumbent on him to actually know before certifying. He shows a degree of recklessness which is tantamount to positive criminality. He shows a heart wholly devoid of a sense of duty, and wholly disregardful of the rights of his fellowmen. He violates a trust reposed in him by those dealing on faith of his signature. He is not simply guilty of negligence, but of outrageous wrongdoing. In so acting, Weaver was *particeps criminis* with M. K. Kendrick, who got the money on these receipts, knowing that the grain was not in the warehouse, since, without Weaver's signature, the receipts could not have been utilized.

The authorities are very numerous supporting the conclusion we have announced, viz.: Note to *Dawe* v. *Morris,* 4 L. R. A., 158, 159, and cases cited; *Bullitt* v. *Farrar,* 42 Minn., 8, 43 N. W., 566, 18 Am. St. Rep., 485, 6 L. R. A., 149, and note, page 150; note to *Hedin* v. *Minneapolis Medical & Surgical Institute,* 35 L. R. A., 430, 431, under title "g," "Statements as of One's Own Knowledge," and "h," "Reckless Statements," page 431, and on page 439, under heading "e," "Matters Stated as Facts, of Which the Speaker is Presumed to Have Knowledge;" *Andrews* v. *Jackson,* 168 Mass., 266, 47 N. E., 412, 37 L. R. A., 402, 60 Am. St. Rep., 390; *Fargo Gas Light & Coke Co.* v. *Fargo Gas & Electric Co.,* 4 N. D., 219, 59 N. W., 1066, 37 L. R. A., 593, and note pages 608-611; *Hindman* v. *First National Bank,* 112 Fed., 931, 50 C. C. A., 623, 57 L. R. A., 108, and particularly page 119; *Shacklett* v. *Bickford,* 74 N. H., 57, 65 Atl., 252, 124 Am. St. Rep., 933, 7 L. R. A. (N. S.), 646 and note; *Aldrich* v. *Scribner,* 154 Mich., 23, 117 N. W., 581, 18 L. R. A. (N. S.), 379 and note; *Morrow* v. *Bonebrake,* 84 Kan., 724, 115 Pac., 585, 34 L. R. A. (N. S.), 1147 and note; *Martin* v. *Hutton,* 90 Neb., 34, 132 N. W., 727, 36 L. R. A. (N. S.), 602; *Westerman* v. *Corder,* 86 Kan., 239, 119 Pac., 868, 39 L. R. A. (N. S.), 500, Ann. Cas., 1913C, 60.

But it is insisted by the defendant company that, regardless of the fraud of Weaver, it is released from the bond, because certain conditions precedent were not complied with. These points are presented in the

fourth, fifth, and ninth assignments, which are as follows:

"Fourth. The court erred in failing to hold that the surety company was discharged from liability on the bond because the complainant failed to comply with the conditions precedent which they agreed to perform and fulfill.

"Fifth. The court erred in failing to hold that the surety company was discharged from liability on said bond because the surety company was fraudulently induced by misrepresentation to issue a bond of Weaver as superintendent of the warehouse when he was not superintendent of the warehouse, nor did he perform any of the duties of such office."

"Ninth. Because of the court's failure to hold that the surety company was discharged on account of the failure of complainants, and especially Kendrick, president of the grain company, to communicate to the surety company, firstly, that Weaver was not warehouseman; secondly, that he was signing warehouse receipts negligently, without knowledge of the truth of their contents; thirdly, of the change of the employment of Weaver; fourthly, that warehouse receipts were being issued without grain being in the bins to cover the same."

It is perceived that the bond considered apart from the rider appears to be a contract wholly between Weaver and the National Surety Company on the one hand, and the Kendrick-Roan Grain & Elevator Company on the other.

The matters specified under the fourth assignment are, first, a violation of the duties of the employer under the paragraph of the bond marked "second" to inform the surety company of any "act, fact, or information tending to indicate that the employee is or may be unreliable, deceitful, dishonest, or unworthy of confidence;" secondly, a violation of the paragraph marked "fifth," and that marked eighth, and the fifteenth.

The points covered by these assignments may be thus summarized, viz.: That the surety company, by misrepresentation, was induced to believe that Weaver was superintendent of the warehouse when he was not so in fact; that he signed warehouse receipts without knowing the truth of their contents, and in this manner showed that he was unworthy of confidence, and the surety company was not informed of this course of conduct; that his duties were changed from that of warehouseman to that of bookkeeper; that the business of the employer was not conducted, and the duties of the employee Weaver did not remain, as provided in the eighth paragraph "in accordance with the written statements made by the employer to the company relative ·thereto," and that thereby, in violation of that paragraph, circumstances had changed which had the effect of making the actual facts different from such statements, and that no written notice was given to the company of such change; that no audit was made of Weaver's business which it is alleged was in violation of the ·fifteenth and eighteenth paragraphs.

This is no evidence of any representation made by the Kendrick Company to the surety company. However, it is clear from the face of the bond itself that the contract between the Kendrick Company and the surety company was that Weaver was to act as superintendent of the warehouse, and we are of the opinion this would be the equivalent of a representation within the sense and meaning of the bond.

So far as concerns the joint conduct of Weaver and M. K. Kendrick, the president, we are of the opinion that they were acting in collusion, and that the knowledge of Kendrick alone would not be binding upon the Kendrick Company, on the principle that knowledge acquired by an unfaithful agent of a corporation in collusion with another unfaithful agent, of their own wrongdoing, is not the knowledge of the corporation, or binding on it. Walker on Fidelity Bonds, sec. 163, pp. 230, 231; *American Surety Co.* v. *Pauly,* 170 U. S., 133, 18 Sup. Ct., 552, 42 L. Ed., 977; *Fidelity & Deposit Co.* v. *Courtney,* 186 U. S., 342, 22 Sup. Ct., 833, 46 L. Ed., 1193; *Wells Fargo & Co.* v. *Walker,* 9 N. M., 456, 54 Pac., 875. However, the fact that Weaver was not active at the warehouse was known to Mr. Roan who was secretary and treasurer of the company, and we think his knowledge would be that of the company. So, if the Kendrick Company were the real complainant here, we believe there could be no doubt that it would be the duty of the court to hold that the surety company was released, on the ground that Weaver was not, to the knowledge of the employer, performing the

duties which he was bonded to perform, but was acting principally as bookkeeper, and only certifying in his own name the acts really performed by another person who was discharging the duties which he had contracted to perform.

But do these considerations apply to the Fourth National Bank? We are of the opinion they do not. It is apparent from the rider, as well as from the facts which we have stated as having transpired while the bond was in course of negotiation, that this instrument was primarily, if not wholly, for the security of the bank. In so far as the provisions in the body of the bond are in conflict with the terms of the rider, the former as between the bank and the surety company must give way. *Carrollton Furniture Co.* v. *American Credit Indemnity Co.*, 124 Fed., 27, 59 C. C. A., 545; 2 Paige on Contracts, sec. 1119. Moreover, bonds of this character are insurance contracts and are to be construed most strongly against the insurer, so as to sustain the liability, if it can be done, in reasonable harmony with the conditions of the instrument. Walker on Fidelity Bonds, pages 8-19 and authorities cited. See, also, Id. 19-32; *Hormel* v. *American Bonding Company*, 112 Minn., 288, 128 N. W., 12, 33 L. R. A. (N. S.), 513 and note; *People, ex rel. Casson,* v. *Rose,* 174 Ill.; 310, 51 N. E., 246 44 L. R. A., 124.

No other conclusion can be derived from the rider than that the chief, if not the sole, purpose of the contract was to protect the Fourth National Bank to the extent of $40,000. The other parts of the bond, in ascer-

taining the rights of the bank, are to be referred to only
so far as to make complete that part of the contract.
So much of it as refers to the duties of the employer,
in the particulars hereinbefore mentioned, were wholly
inapplicable to the bank, and could not have been per-
formed by it, and were not expected to be performed
by it.   The fact must be recognized that the surety
company imposed, on the form of a bond applicable
only to an employer and employee, wherein the em-
ployer is protected against the improper conduct of
the employee, a totally different obligation; that is,
security to a bank against improper conduct of some
employee of the company.   So much of the bond, or
form of bond, as is inapplicable to the latter phase
must be held inapplicable to the bank.   This must be
the true construction, or else it must be held that the
bank became responsible for the conduct of the em-
ployer, and that the failure of the latter to perform
the various duties referred to would defeat the se-
curity held by the bank; whereas, it is perfectly evi-
dent from the rider that the security which the bank
was to obtain was against the unfaithfulness of the
warehouseman Weaver, and that his signature was to
be accompanied by that of an officer of the Kendrick
Company, to make more certain the fact that Weaver
would issue only honest warehouse receipts.   In other
words, the surety company guaranteed to the bank the
good conduct of both Weaver and the Kendrick Com-
pany.   To hold the bank responsible for the conduct
of the Kendrick Company in not giving notice to the

surety company, that servant was defrauding the bank, would be to place upon the latter a need of watchfulness and oversight of the workings of the Kendrick Company which would not only be practically impossible to the bank, but, if exercised, would render wholly useless the guaranty or insurance contracted for. The parties, therefore, could never have intended to enter into an arrangement of that kind. Certainly it is true that the failure of the employer to discharge the duties prescribed would in case of a loss caused by the fault of the bonded servant prevent any recovery on the employer's part against the surety company in case of recovery by the bank against the employer. But as between the bank and the surety company would this be the true result? It is said in the rider: "It is specifically conditioned by the surety company that the only warehouse receipts referred to are such as may be signed by the employee as warehouseman in conjunction with an officer of the employer." It would seem that as between the bank and the surety company all the former was required to do was to see that the warehouse receipts were so signed, and that they did not exceed altogether more than $40,000 face value. The whole contract could then stand together. The provision referred to, as regards the duties of the employer, would be binding as between the employer and the surety company, but not applicable to the bank. Under this construction the exact terms of the bond and of the rider would be brought into harmony, and would, as it seems to us, express the specific purpose,

as well as the general purpose, of the whole instrument. Any other view would make the rider and the body of the bond a misfit. Under this construction the whole bond can stand, and the bond and the rider can stand together. Under a construction making the bank responsible for the failure of duty on the part of the employer, language adapted only in the bond to the employer would be violently wrenched so as to be made applicable to the bank, and practically to defeat the specific purpose of insuring the bank. What has just been said is equally applicable to the other specifications in the assignments quoted, and they need not be more particularly referred to.

The next question that arises is as to the extent of the recovery. Is the complainant entitled to the full face of the bond, $40,000? We think not. Its action, while in form for enforcement of a contract, is in substance and effect an action for fraud practiced on it by the bonded employee Weaver. To justify a recovery, there must not only be fraud but damage as well. Obviously the amount of the recovery must be measured by the amount of the damage or injury. It is admitted in the bill, as shown by the excerpt which we have made from it, that there was some grain to cover in part nearly all the several warehouse receipts therein mentioned. To the extent of the value of the grain so in store at the date of the issuance of each receipt, there was absence of injury. The complainant's damages would therefore be measured by the difference between the market value of the grain so in store,

at the dates mentioned, and the market·value 'of the total amount represented in each receipt as being on hand to cover that receipt. These values appear in the record, and the result can be ascertained by mere calculation. The measure of damages we have stated is in substance that applied in *Hindman* v. *First National Bank,* 112 Fed., 931, 50 C. C. A., 623, 57 L. R. A., 108, 114, with the distinction that market value is applicable in the case before us, the subject-matter being tangible property, not shares of stock as in the case referred to. *McDonald* v. *Unaka Timber Company,* 88 Tenn., 38, 43, 45, 12 S. W., 420; *Paragon Refining Co.* v. *Lee Bros.,* 98 Tenn., 643, 41 S. W., 362; *Cole* v. *Zucarello,* 104 Tenn., 64, 56 S. W., 850.

It is not material, in the present action, that the Kendrick Company subsequently disposed of all of the grain, and when demand was made in July, 1909, several months after the warehouse receipts had been issued for this grain, there was none on hand to meet it. The representation made by Weaver must be tested by the facts as they existed at the date each certificate or receipt was issued by him. By this the liability of the surety company would be not only fixed, but limited. That liability could not be increased by subsequent acts of the Kendrick Company in disposing of the grain. It is true the Kendrick Company would be liable for such subsequent disposition, as a conversion of the property. But the bond did not bind the surety company to see to it that the grain covering the receipts should remain in the warehouse for four months

and over, but only that the receipts should truly represent grain when issued. When so set apart, it is true, as understood between the bank and the Kendrick Company, the grain belonged to the bank for the purpose of its security; but it was in the custody of the Kendrick Company, to which the warehouse belonged. Weaver was not a warehouseman in the sense of being the owner of the warehouse, nor did he have any control of shipments. The record shows that the warehouse belonged to the Kendrick Company, and Weaver was only its employee. It was not a public bonded warehouse, under our statute, but merely the private warehouse of the Kendrick Company, used as an adjunct to its grain business.

Perhaps it is unnecessary to remark that the result would be quite different if the present bill were one for rescission. In such a case, of course, the bank could repudiate the receipts wholly, if there was not grain behind them to the full extent represented. But this suit must stand on different principles.

The next question is whether the complainant is entitled to recover anything on the penalty sued for.

As we have already declared, bonds of the kind sued on are treated as insurance contracts. Our statute provides that in suits on such contracts a penalty of not exceeding 25 per cent. of the liability for the loss may be recovered provided the refusal to pay such loss was not in good faith. Acts 1901, ch. 141; *Continental Fire Ins. Co.* v. *Whitaker & Dillard,* 112 Tenn., 168, 169, 79 S. W., 119, 64 L. R. A., 451, 105 Am. St.

Rep., 916. From the *proviso* it is perceived that the penalty does not follow a recovery as a matter of course, and that the statute does not penalize insurance companies for defending suits brought against them, even though they should ultimately lose. They may defend in good faith, and we cannot say the surety company did not act in good faith in interposing its defense in the case before us. Without doubt there was enough in the case to justify a contest, seeing the difficulty attendant upon the construction of the contract as a whole, including the rider, and also the deduction that must be made from the amount sued for, in view of the fact that the warehouse receipts were not wholly unsupported by grain in store.

It is unnecessary to consider the questions made in the other assignments of error. They have all been sufficiently covered in what we have already said.

The chancellor's decree must therefore be reversed, in so far as he permitted a recovery for a penalty of $10,000. It must be modified as to the recovery of $40,000 on the bond, so as to reduce that recovery by the market value of the grain in store for each of the warehouse receipts described in the bill, at the date of each receipt, as shown in the bill.

The costs will be divided between the parties in the proportion of three-fourths against defendant company and Joseph H. Weaver, and one-fourth against complainant.