## GLOBE INDEMNITY CO. v. UNION & PLANTERS' BANK & TRUST CO.

Circuit Court of Appeals, Sixth Circuit. July 5, 1928.

No. 4860.

**1. Insurance** ☞430—Where bank official agreed bank would take back paper he personally sold before his renewal bond was made in one case, and before original bond in another case, bondsman was liable on bonds in force, when loss occurred where bank took up paper.

Where bank official personally sold paper to other banks, but agreed that bank would take back paper sold when requested, and after loss occurred bank took back paper, bondsman was liable on official's bond, though his original agreement to take back paper sold was made before renewal bond, in force when loss occurred, was made in one case, and in another case before original bond.

**2. Frauds, statute of** ☞119(1)—Agreement by bank official on behalf of bank to take up paper sold was not void under statute of frauds, as against innocent purchaser banks.

Agreement by bank official, on whose bond defendant was surety, on behalf of plaintiff bank to take up paper wrongfully sold to other banks

was not void under statute of frauds as against innocent purchaser banks.

**3. Insurance** ☞430—Bank official's Indemnity bond held to include loss by bank's taking up notes without previous adjudication of liability on notes personally sold by official.

Bank official's indemnity bond *held* to cover amount of notes taken up by bank in accordance with agreement by bank official, without previous adjudication of bank's liability on notes personally sold by bank official under agreement to take back notes when requested.

**4. Banks and banking** ☞116(1)—Knowledge by certain employees of vice president's fraudulent acts was not knowledge of bank suing on vice president's bond.

Knowledge by certain of bank's employees of fraudulent acts of vice president, and that vice president was in habit of having tickets in tellers' cages, and that this practice had been going on for several years, did not make acts open, and did not amount to notice to, or knowledge of, plaintiff bank, suing on vice president's bond.

**5. Insurance** ☞646(1½)—Bondsman had burden of proving bank suing on bond, knew of dishonest practices of official.

In action on bond of vice president of bank, bondsman had burden of proving that bank had knowledge or reason to believe that vice president was engaged in dishonest practices.

**6. Insurance** ☞665(3)—Evidence held not to show bank, suing on official's bond, knew official was engaged in hazardous speculations, in contravention of statement in application for bonds.

In action on bond of vice president of bank, evidence *held* not to show that bank officials and directors had knowledge or reason to believe that official was engaged in hazardous speculations, in contravention of statement in application for defendant's bonds that nothing was known concerning habits of plaintiff's employees which would affect their title to confidence.

**7. Pleading** ☞236(3)—Refusing amendment to plea tendered on opening of trial was within court's reasonable discretion.

Refusing an amendment to plea tendered on morning of opening of trial was within reasonable discretion of court.

**8. Pleading** ☞352—In bank's action on official's bond, striking out plea alleging culpable negligence of bank's officers held not error under evidence.

In action on bond of bank official, court's striking out plea alleging culpable negligence amounting to bad faith on part of bank's officers and directors *held* not error, where there was no evidence showing such negligence.

**9. Insurance** ☞665(3)—Evidence held not to show bank, suing on bond, was chargeable with knowledge of fraudulent actions of bank official.

In action on bond of vice president of bank, evidence *held* not to show that bank was chargeable with knowledge of fraudulent and dishonest actions of vice president.

10. **Insurance ⟨⟩602—Bank, suing on official's bond, held not entitled to statutory penalty for refusal to pay loss within 60 days (Shannon's Code Tenn. § 3369a141).**

Bank, suing on bond of vice president, *held* not entitled to penalty under Laws Tenn. 1901, c. 141 (Shannon's Code Tenn. § 3369a141), for failure to pay loss within 60 days after demand, where evidence showed refusal to pay was in good faith.

In Error to the District Court of the United States for the Western District of Tennessee; Harry B. Anderson, Judge.

Action by the Union & Planters' Bank & Trust Company against the Globe Indemnity Company. Judgment for plaintiff, and defendant brings error. Affirmed conditionally.

J. J. Lynch, of Chattanooga, Tenn. (Allison, Lynch & Phillips, of Chattanooga, Tenn., F. A. W. Ireland, of New York City, Robert I. Moore, of Memphis, Tenn., and James J. McGuirk, of Newark, N. J., on the brief), for plaintiff in error.

Guston T. Fitzhugh, of Memphis, Tenn., for defendant in error.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. Defendant in error (hereinafter called plaintiff), a banking corporation organized under the laws of Tennessee and doing business at Memphis, brought suit against plaintiff in error (hereinafter called defendant), a corporation organized under the laws of New York, and having an office or agency at Memphis, to recover the amount lost by plaintiff through the fraud, dishonesty, and misapplication of plaintiff's banking funds by its salaried vice president, Robert S. Polk, against whose misconduct defendant had contracted to indemnify plaintiff under two certain bonds or policies, each issued by defendant January 15, 1921, and renewed annually thereafter, covering all of plaintiff's employees and salaried officers—one of the policies being a so-called "schedule bond No. 403," under which defendant's liability on account of Polk's misconduct was fixed at and limited to $30,000; the other policy being a so-called "bankers' blanket bond No. 407," under which plaintiff was indemnified in the aggregate amount of $100,000, without apportionment of liability on account of individual employees or salaried officers.[1] The case was tried to a jury.

Under the evidence, plaintiff claimed right to recover the aggregate sum of $130,000, viz. $115,022.39, plus interest thereon of $17,097.84, less rebate of $2,120.23, to reduce the recovery to defendant's liability under the two bonds in suit.[2] Plaintiff also sought to recover penalty not exceeding 25 per cent. of liability for loss under the indemnity policies for refusal to pay the same within 60 days after demand, provided by section 3369a141 of Shannon's Tennessee Code (chapter 141 of the Acts of 1901), in case it appears that the refusal to pay the loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury upon the policy holder. The defendant asserted its nonliability, either in whole or in part, for the plaintiff's claimed losses under the two policies—both on the merits generally and for alleged lack of compliance by plaintiff with certain policy requirements for defendant's benefit to be hereinafter stated.

Each party asked the trial court for directed verdict in its favor upon the question of original liability under the policies. Plaintiff also requested the submission to the jury of the claim for penalty. Manifestly, if defendant's motion for directed verdict on the question of its liability under the policies were granted, or if the jury's verdict should be for defendant on the merits, there could be no penalty. The court denied defendant's request for directed verdict, and instructed verdict for plaintiff for the full amount of the claimed liability under the policies, submitting the question of penalty alone under a charge to which no exception was taken. The jury awarded a penalty of $16,250, in which were included attorney's fees fixed at $12,500. Judgment was entered accordingly, to review which this writ is brought.

We think the judgment of the District Court should be affirmed, so far as concerns plaintiff's directed recovery of $130,000 upon the merits of its claim, and without present reference to the matter of penalty. In the view we take of the merits, we find it un-

[1] Under the schedule bond the indemnity was against "any act or acts of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction or wilful misapplication"; under the blanket bond

against loss "through any dishonest act of any of the employees, wherever committed, and whether committed directly or by collusion with others."

[2] The detail of claimed recovery of principal is this:

| | |
|---|---|
| Cash shortage in cage of Teller Scrivener | $ 41,958 88 |
| Liberty Bond fund shortage, beginning back from February 19, 1921 | 26,784 52 |
| Loss on account Memphis Lumber Corporation | 15,000 00 |
| Loss on account A. C. Cox matter | 2,278 99 |
| Loss on account Blue Mountain Bank matter | 21,500 00 |
| Loss on account Merchants' & Farmers' Bank of Durant matter | 7,500 00 |
| Total | $115,022 39 |

27 F.(2d)—32

necessary to consider whether the mutual requests for directed verdict empowered the trial court to determine the facts. We think that, apart from the question of penalty, plaintiff's right to recover was established by the undisputed testimony.

*The Cash Shortage in Scrivener's Cage.*— On March 17, 1924, on a concurrent examination by the Tennessee state and the Federal Reserve examiners, begun several days previously and interrupted, there was discovered a cash shortage in Scrivener's cage of $41,-958.88. According to the undisputed evidence of Scrivener, the shortage resulted from the "borrowing" of funds from time to time by Polk, who was an acting and senior vice president of the bank, in control of all the tellers, with full power to "hire and fire." Polk also performed the duties of cashier. This "borrowing" by Polk had been going on for several years; Polk's practice being to give Scrivener debit or cash "tickets" for the money so "borrowed," and when the examiners appeared—either the public bank examiners or those representing the plaintiff bank —to take up the "tickets." According to Scrivener's undisputed testimony, "Polk always managed to pay up his cash items and tickets after the bank examiners came there. He would handle it regularly. * * * He had always taken all of the tickets and taken care of them. I just gave them to him in the usual way."

Most of the tickets so handled by Polk were in form for different companies in which he was financially interested, and for which he was assuming to be dealing. During the period covered by the bank examination of March, 1924, hereinafter referred to, for the purpose of covering his then existing shortage, Polk took up his then outstanding tickets and made the cash balance in Scrivener's cage appear good by means of fictitious entries, as, for example, putting in as cash items deposited by the bank's customers, and so temporarily withheld from credit to the depositors' accounts. Scrivener testified that "that was the first time he did that, so far as I know." And again: "It was his irregularity that caused him this trouble. He had always taken all of the tickets and taken care of them."[3] On the trial, and during the examination of the witness Scrivener, it was admitted by defendant's counsel that "the

covering up was done in the method illustrated, without going any further into it."

*The $15,000 Check of the Memphis Lumber Corporation,* included in the recovery below, was a check drawn on that corporation by one Smith, and which was used by Polk, who was an officer of that corporation, to help reduce his shortage in Scrivener's cage, at the time of the examination in March, 1924, to the sum of $41,958.88. We find no evidence which we think tends to show any authority in Polk to use the check for his own purposes. The evidence is to the contrary. On the demand of the bank's president (Hill), who was also president of the Memphis Lumber Corporation, made after the discovery of the shortage in Scrivener's cage, the $15,000 was properly returned to the Memphis Lumber Corporation. In the situation stated the plaintiff bank could not have been a good faith holder of the $15,000 check.

[1-3] *The Liberty Bond Fund,* the shortage in which ($26,784.52) was included in plaintiff's recovery, represented the profits made by the bank on the purchase and sale of Liberty Bonds owned by it. According to Scrivener's undisputed testimony, the moneys pertaining to that fund were kept in a box, the detail at least of the transactions with the fund not getting on the bank's books, but being kept on a separate book of the teller in his cage. (It is perhaps not clear whether the *amount* of the fund may or may not have appeared generally on the bank's books.) About $4,400 of the Liberty Bond Fund was testified, without dispute, to have been used by Polk to help reduce his cash shortage in Scrivener's cage to the amount of the balance scheduled above; about $19,000 for the purchase of various blocks of stock in plaintiff's bank, the stock being taken in different names, including those of at least two different employees and one officer of plaintiff bank as "trustee"; a part of the fund in question was used for paying interest on the Merchants' & Farmers' Bank of Durant and the Blue Mountain Bank notes, in which notes Polk was alone interested, and which notes (the country bank's notes) he had sold to the two named banks as the property of plaintiff bank (which was not the case), and under an agreement as of that bank to take back the securities when requested by the two purchasing banks. The testimony to the effect stated

---

[3] Scrivener later testified: "I did not mean to be understood as saying that Mr. Polk in settling up for any of the previous tickets before this occasion [evidently meaning the occasion of the examination in March, 1924] had ever made any false entries or committed any improper practice in making settlement with me." He added: "When a committee from the directors, or Homer K. Jones, auditor, would come around, Polk's tickets would be taken out, or he would take them out. After the committee, or Mr. Jones, left, I frequently got back some of the same tickets, and he would put them in my cage."

was undisputed. The plaintiff bank, after the March 17th discovery of Polk's asserted fraud and dishonesty, was called upon to take up and properly did take up, the securities in question.

Nor do we think defendant relieved of liability by the fact that Polk's original agreement to take back the paper sold was made before the renewal bond in force when the loss occurred was made, and, in the case of the Blue Mountain Bank, before the predecessor (or original) bond of 1921. From time to time paper sold was taken up and new paper sold. There was undisputed testimony on the part of both purchaser banks that the agreement to take back was to last as long as the existing situation continued; as expressed by the officer of one of the banks, "As long as this county fund was in our hands, and as long as the bond [presumably the bond given the county] was in force." The losses occurred while the last renewal bond was in force. The paper taken up by plaintiff bank was apparently negotiated during the life of the last renewal of the respective indemnity bonds in suit. The solvency of the makers of the notes so sold did not, we think, make it improper for plaintiff bank to take up the negotiated paper. Nor do we think the alleged agreement by Polk, on behalf of plaintiff bank, to take up the paper, void under the statute of frauds, as against innocent purchaser banks. We think no previous adjudication of the plaintiff's liability was necessary. Ocean, etc., Corporation v. Old Natl. Bank (C. C. A. 6) 4 F.(2d) 753.

*The Cox item* of $2,278.99, included in plaintiff's recovery, represented a balance of that amount to which Cox was entitled from a check turned over by him to plaintiff bank through Polk, after paying an amount to which the bank was entitled. No credit to Cox appeared on the bank's books, and after Polk's death Cox demanded and received the money from plaintiff bank. Scrivener testified, without dispute, that Polk applied the Cox check to help reduce the cash shortage in Scrivener's cage.

Of defendant's contention that an instructed verdict cannot rest upon unsupported, though undisputed, testimony of Scrivener, as being an interested witness it seems enough to say that there was convincing testimony, from several sources, corroborating Scrivener's testimony in important respects relating to each of the items included in plaintiff's recovery. One of the bank examiners testified to the manner in which the cash shortage was in large part covered, and to Polk's disappearance two days before the cash short-

age was discovered. The bank's chief clerk testified to the issue to him, by Polk's action, of a block of bank stock, his indorsement and delivery of same to Polk, the issue of the notes of himself and others secured by the "trusteed" bank stock and sent to the Farmers' & Merchants' and Blue Mountain Banks; the fact that plaintiff bank had no interest in such notes and stock, and that the same was not on the bank's books; Polk's agreement, given to the purchasing banks, that plaintiff would take the paper back at the same discount at which it was negotiated by Polk; to the existence of a book kept locked in the chief clerk's desk, not a book of the bank, which Polk bade the witness keep in his desk as Polk's private property, and which contained a record of all the paper sent out, whether from the bank's files or representing Polk's private concerns, together with other records of the bank under Polk's control; also that Polk returned to the city, but not to the bank, shortly after his disappearance on March 15th, and inquired of the chief clerk, by telephone from a pay station, whether the bank examiners were still in the bank, and whether they had opened his private desk, and was told that they had. The witness also said that the dividend checks were in his (apparently meaning Polk's) private desk, and that the stocks purchased from the Liberty Bond profits were "found in his box downstairs." In the case of each of the two purchaser banks (Merchants' & Farmers' and Blue Mountain) there was testimony of an officer of such bank to the effect that the paper was purchased as the paper of plaintiff bank, and under Polk's agreement, as vice president, that it would be taken back whenever desired by the purchaser at the same discount at which it had been sold, and that such arrangement had been in existence for a considerable period before the collapse. There was also testimony showing convincingly that Polk's death about a week after his disappearance was suicidal.

We see no merit in defendant's contention that Polk's actions were not shown to have been fraudulent or dishonest, but were shown to be open and presumably known (or such as should have been known) to the officers of the bank; and thus that the greater part of the plaintiff bank's claim fell within the provisions of the blanket policy forbidding recovery for losses resulting from loans made by employees, whether authorized or unauthorized, unless made with intent on the part of such employee to defraud the bank. (See note 1, supra.)

[4, 5] No argument is needed to show that

Polk's alleged acts were inherently dishonest and fraudulent, and that knowledge by certain of the bank's employees of the specific acts in question, or even general knowledge on the part of the bank's tellers, that Polk was in the habit of having tickets in Scrivener's cage, and in the cages of other tellers, and that this practice had been going on for several years, did not make the acts "open" in any proper sense, and did not amount to notice to or knowledge of the plaintiff bank. Fidelity Co. v. Courtney, 186 U. S. 342, 360, 22 S. Ct. 833, 46 L. Ed. 1193, et seq. Indeed, it was the undisputed testimony of the president, two vice presidents, and two other members of the board of directors, and of either the bank's examining or finance committee, that prior to Polk's disappearance neither they, nor any of the other officers or directors, so far as they knew, or had reason to believe, had any knowledge, information, or reason to believe that Polk was taking cash from the tellers' cages, or was engaged in the dishonest practices here complained of.

We think no substantial inference to the contrary can be drawn from the fact that plaintiff did not call quite all of the bank directors or officers. Defendant carried the burden of proof on that subject. It was equally open to it to controvert plaintiff's evidence. Moreover, the undisputed testimony showed that during the period covered by the transactions in question it was not the practice of the bank to make loans to its officers; that the loans made were regularly read to the discount committee from 1921 to 1924, Polk attending the meetings of that committee; that, where a director was interested in any firm which made loans, the latter were read to the finance committee, and that a special list was read at the meetings of the board of directors, the reading being done by Polk when he was in the city; that, so far as the witnesses knew, during the entire time stated no loans to any officer were read out, and that neither the name of Polk nor of any other director appeared in the lists of borrowers so read. The president of the bank, who was also then an officer of the Memphis Lumber Corporation, testified that at no time while he was acquainted with the business of that corporation had Polk been authorized to use its funds for his own individual transactions.

In this connection it may be stated that it appeared by undisputed testimony that upon the receipt at one time of information, purporting to come from one of the bank's vice presidents and given by the bank's chief clerk, of the existence of the book showing sales of notes to country banks (such as the Merchants' & Farmers' and Blue Mountain), this vice president told the president, whereupon Polk was called before the president and this vice president, and gave the explanation and assurances satisfactory to both those officers that it was good paper he had sold the customers of the bank, and that the bank was in no way liable. The vice president further testified that Polk said that he "had made it plain to the banks that it was a concern in which he and Mr. Hill were interested—or outside paper."

Mr. Bragg, one of the bank's vice presidents, in whose name as trustee some of the bank stock bought by Polk was taken, and whose notes were among those sold the "country banks," testified, without dispute, that he was not interested in the negotiated notes, that they were signed at Polk's request for his accommodation, and that the witness got none of their proceeds and did not know of their negotiation, or that the bank had guaranteed to take them up when the purchaser wished to negotiate them, but that his first knowledge that Polk had done anything wrong was when the bank examination of March, 1924, was had, at which time Polk disappeared. The testimony elicited, on cross-examination by defendant's counsel of one of plaintiff's witnesses, was undisputed that Polk had worked his way up from boyhood in that bank; that he was at the time of the transactions in question a large stockholder and one of the dominating forces in the bank, and had been active and valuable in building it up; that he was connected with the bank's president in a great many business enterprises, and had until his death been considered solvent, but on his death turned out to be insolvent. It also appeared, without dispute, that the state and federal authorities made their examinations twice a year, and that on the last examination before March, 1924, viz. October, 1923, no shortage was found. The bank's own representatives made periodical examinations.

[6] We think neither the testimony we have referred to, nor any and all other testimony given, would sustain a substantial inference that the bank's officers and directors had, previous to March 17, 1924, any knowledge, information or reason to believe that Polk was engaged in "hazardous speculations," in contravention of the statement in the application (there is a dispute as to whether this application was signed) for the defendant's bonds, that nothing was known concerning the habits of plaintiff's employees which would affect their title to confidence.

[7] It seems clear that there was no error in refusing, as immaterial, an amendment to defendant's fifteenth plea, tendered on the morning of the opening of the trial, in further specification of the subject of "extensive business ventures and speculations." Not only was the granting or refusing of the amendment within the reasonable discretion of the judge—it does not appear to have been abused—but we think the subject-matter of the proposed amendment admissible under the original plea, and the lack of error is emphasized by the absence of testimony sustaining the amendment.

[8] Nor do we find any evidence tending to show a violation of the requirement of notice to defendant as soon as possible after learning of a default which might be made the basis of a claim. Indeed, defendant admitted on the trial that plaintiff had complied in all respects with the terms of the bonds regarding "giving notice of the losses under the bonds." It follows from what we have already said that we find no evidence of willful and culpable negligence amounting to bad faith on the part of the bank's officers and directors, and there was thus no prejudicial error in striking out the plea alleging such negligence. The record makes it clear that defendant introduced all the evidence it wished which it thought had this tendency, and did so without regard to the technical restriction indicated by striking out this plea.

[9] We think it clear that plaintiff bank is not shown to be chargeable with knowledge of the fraudulent and dishonest actions of Polk here involved; that notice to the tellers was not notice to the bank's officers; that there is no presumption that the tellers notified the executive officers of Polk's misconduct; and that there is thus no basis for the contention that defendant has been prejudiced or misled by any failure on the part of the bank's officers or directors to give notice of Polk's misconduct.

We therefore think the verdict and judgment right, so far as concerns plaintiff's recovery on the merits of its claim.

[10] The recovery of the penalty of $16,250 presents other considerations. Since this case was submitted to us, the Supreme Court of Tennessee has decided that the penalty statute here invoked has no application to contracts of fidelity insurance such as that before us. People's Bank & Trust Co. v. United States Fidelity & Guaranty Co., 3 S.W.(2d) 163. That court had previously assumed otherwise. Kendrick-Roan Grain Co. v. Weaver, 128 Tenn. 609, 634, 635, 163 S. W. 814; Kimball v. Parks, 151 Tenn. 103, 268 S. W. 117.

Plaintiff contends, however, that the recent decision in the People's Bank & Trust Co. Case, referred to, can have no retroactive effect upon the judgment in this cause, which had then already been rendered. We find it unnecessary to consider this contention, for we think the record contains no evidence reasonably tending to show that defendant's action in refusing to pay the loss in question "was not in good faith." The Supreme Court of Tennessee has more than once declared that this penalty statute must be strictly construed. Insurance Co. v. Kirkpatrick, 129 Tenn. 55, 164 S. W. 1186; Kimball v. Parks, supra. Cf. Kendrick-Roan Grain Elevator Co. v. Weaver, 128 Tenn. 609, 635, 163 S. W. 814, 821, where it is said: "The statute does not penalize insurance companies for defending suits brought against them, even though they should ultimately lose." "The words 'not in good faith' imply a lack of good or moral intent as the motive for the refusal to pay a loss." Silliman v. Insurance Co., 135 Tenn. 646, 647, 648, 188 S. W. 273. Cf. Harowitz v. Fire Insurance Co., 129 Tenn. 691, 703, 704, 168 S. W. 163; Columbian Co. v. Harrison (C. C. A. 6) 12 F.(2d) 986, 990; Commercial, etc., Co. v. Marshall (C. C. A. 6) 18 F.(2d) 457, 460.

We find no substantial evidence which we think reasonably indicates that defendant had such a frame of mind. Although before suit was begun defendant had been given by plaintiff considerable information about the facts, presumably it did not possess, before the trial, the complete knowledge which the trial gave. But, were it otherwise, a refusal to pay through a lack of good or moral intent would seem highly abnormal. The serious examination and discussion we have given this case would scarcely have been called for, had it been fairly apparent that defendant's refusal to pay was in bad faith.

If plaintiff shall see fit to file in the court below, within 20 days after the filing of this opinion, a remittitur of the amount of penalty recovered, and immediately thereafter file in this court a certified copy of such remittitur, the judgment, as so modified, will be affirmed. Otherwise, the judgment will be reversed, and the cause remanded to the District Court, with directions to award a new trial.